UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Qian Yuan Service, LLC, | ) | Case No. 1:25-53837-lrc |
| d/b/a H&Z Massage | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| Northland Chamblee, LLC d/b/a The | ) | |
| Deco at 5211 | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | CONTESTED MATTER |
| | ) | |
| Qian Yuan Service, LLC, | ) | |
| d/b/a H&Z Massage, and | ) | |
| Cathy L. Scarver, Chapter 7 Trustee | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## <u>NOTICE OF HEARING</u>

PLEASE TAKE NOTICE that Northland Chamblee, LLC d/b/a The Deco at

5211 has filed a motion for relief from stay (the "Motion") and related papers with

the Court seeking an order granting relief from the automatic stay.

PLEASE TAKE FURTHER NOTICE that the Court will hold a hearing on

the Motion at 10:00 a.m. on June 18, 2025 in Courtroom 1204, United States

Courthouse, 75 Ted Turner Drive, SW, Atlanta, Georgia 30303, which may be

attended in person or via the Court's Virtual Hearing Room. You may join the Virtual Hearing Room through the "Dial-In and Virtual Bankruptcy Hearing Information" link at the top of the homepage of the Court's website, www.ganb.uscourts.gov, or the link on the judge's webpage, which can also be found on the Court's website. Please also review the "Hearing Information" tab on the judge's webpage for further information about the hearing. You should be prepared to appear at the hearing via video, but you may leave your camera in the off position until the Court instructs otherwise. Unrepresented persons who do not have video capability may use the telephone dialin information on the judge's webpage.

Your rights may be affected by the Court's ruling on these pleadings. You should read these pleadings carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.) If you do not want the Court to grant the relief sought in these pleadings or if you want the Court to consider your views, then you and/or your attorney must attend the hearing. You may also file a written response to the pleadings with the Clerk at the address stated below, but you are not required to do so. If you file a written response, you must attach a certificate stating when, how and on whom (including addresses) you served the response. Mail or deliver your response so that it is received by the Clerk before the hearing. The address of the Clerk's Office is:

Clerk, U. S. Bankruptcy Court, Suite 1340, 75 Ted Turner Drive, SW, Atlanta

Georgia 30303. You must also mail a copy of your response to the undersigned at

the address stated below.

If a hearing on the Motion cannot be held within thirty (30) days, Movant

waives the requirement for holding a preliminary hearing within thirty days of filing

the Motion and agrees to a hearing on the earliest possible date. Movant consents to

the automatic stay remaining in effect until the Court orders otherwise.

Dated: 5/22/2024

/s/ Brian S. Goldberg
Brian S. Goldberg
Buchalter APC
3475 Piedmont Road NE, Suite 1100
Atlanta, GA 30305
Phone: 404-832-7667
Email: bgoldberg@buchalter.com
Attorney for Northland Chamblee LLC d/b/a The Deco at 5211

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| Qian Yuan Service, LLC, | ) Case No. 1:25-53837-lrc |
| d/b/a H&Z Massage | ) |
| | ) Chapter 7 |
| Debtor. | ) |
| _____ | ) |
| Northland Chamblee, LLC d/b/a The | ) |
| Deco at 5211 | ) |
| | ) |
| Movant, | ) |
| | ) |
| v. | ) CONTESTED MATTER |
| | ) |
| Qian Yuan Service, LLC, | ) |
| d/b/a H&Z Massage, and | ) |
| Cathy L. Scarver, Chapter 7 Trustee | ) |
| | ) |
| Respondents. | ) |
| | ) |

## NORTHLAND CHAMBLEE LLC D/B/A THE DECO AT 5211'S MOTION FOR RELIEF FROM AUTOMATIC STAY

COMES NOW Northland Chamblee LLC ("Movant"), by and through undersigned counsel, and pursuant to 11 U.S.C. § 362(d)(1) and Fed. R. Bankr. P. 4001, respectfully moves this Court for entry of an order granting relief from the automatic stay to allow Movant to pursue its state law remedies with respect to nonresidential real property located at 5211 Peachtree Boulevard, Suite 1100,

Chamblee, Georgia 30341 (the "Premises"). In support of this Motion, Movant shows the Court as follows:

## JURISDICTION AND BACKGROUND

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

3.      On April 7, 2025, Qian Yuan Service, LLC, d/b/a H&Z Massage ("Debtor"), filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

4.      Movant is the lessor and Debtor is the lessee under that certain Lease Agreement dated August 3, 2022 (the "Lease"), for the Premises. A true and correct copy of the Lease is attached hereto as **Exhibit "A"** and incorporated herein by reference.

5.      The Lease is an unexpired lease of nonresidential real property within the meaning of 11 U.S.C. § 365(d)(3).

## GROUNDS FOR RELIEF

6.      The Debtor continues to occupy the Premises postpetition but has failed to pay rent due May 1, 2025.

7.      Section 365(d)(3) of the Bankruptcy Code requires that a debtor or trustee "timely perform all the obligations of the debtor… arising from and after the order for relief under any unexpired lease of nonresidential real property."

8.      The Debtor has failed to timely perform its obligations under the Lease by failing to pay postpetition rent and related charges.

9.      This constitutes "cause" for granting relief from the automatic stay under 11 U.S.C. § 362(d)(1).

10.      Movant lacks adequate protection of its interests in the Premises, and allowing the Debtor to continue to occupy the Premises without paying rent imposes an undue burden on the landlord and the bankruptcy estate.

## REQUEST FOR RELIEF

WHEREFORE, Movant respectfully requests that the Court:

a) Grant relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) to permit Movant to pursue all remedies under the Lease and applicable state law, including recovery of possession of the Premises;

b) Waive the 14-day stay provided in Fed. R. Bankr. P. 4001(a)(3); and

c) Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 24th day of May, 2025.

/s/ Brian S. Goldberg
Brian S. Goldberg
Buchalter PC
3475 Piedmont Road NE, Suite 1100
Atlanta, GA 30305
Phone: 404-832-7667
Email: bgoldberg@buchalter.com
Attorney for Northland Chamblee LLC d/b/a The Deco at 5211

## <u>Certificate of Service</u>

I hereby certify that on the 24th day of May, 2025, I electronically filed the

foregoing Motion for Relief from Stay and Notice of Hearing using the Bankruptcy

Court's Electronic Case Filing program, which sends a notice of this document and

an accompanying link to this document to the following parties who have appeared

in this case under the Bankruptcy Court's Electronic Case Filing program:

William A. Rountree
Rountree Leitman Klein & Geer, LLC
Century Plaza I, Suite 350
2987 Clairmont Road
Atlanta, GA 30329

Cathy L. Scarver
P. O. Box 672587
Marietta, GA 30006

U.S. Trustee
Office of the United States Trustee
362 Richard Russell Building
75 Ted Turner Drive, SW
Atlanta, GA 30303

I further certify that on this day I caused a copy of this document to be served
via United States First Class Mail with Adequate Postage Prepaid on the following
parties at the address shown for each.

Qian Yuan Service LLC
5211 Peachtree Blvd
Atlanta, GA 30341

BN 89428809v1

Dated: 5/22/2024

/s/ Brian S. Goldberg
Brian S. Goldberg
Buchalter PC
3475 Piedmont Road NE, Suite 1100
Atlanta, GA 30305
Phone: 404-832-7667
Email: bgoldberg@buchalter.com
Attorney for Northland Chamblee LLC d/b/a The Deco at 5211

## EXHIBIT "A"
Lease

# LEASE

BY AND BETWEEN

## NORTHLAND CHAMBLEE LLC

(LANDLORD)

AND

## QIAN YUAN SERVICE, LLC D/B/A H&Z MASSAGE

(TENANT)

# TABLE OF CONTENTS

**Article I. BASIC LEASE DATA, EXHIBITS, AND RIDERS**................................................1
    1.1    Introduction..................................................................................1
    1.2    Basic Data....................................................................................1
    1.3    Enumeration of Exhibits..............................................................3

**Article II.**.........................................................................................4
    2.1    Condition of Premises..................................................................4
    2.2    Appurtenant Rights and Reservations...........................................4

**Article III. TERM OF LEASE**............................................................6
    3.1    Initial Term..................................................................................6
    3.2    Options To Extend........................................................................6

**Article IV. RENT**..............................................................................6
    4.1    Minimum Rent.............................................................................6
    4.2    Percentage Rent...........................................................................7
    4.3    Lease Year..................................................................................10

**Article V. USE OF PREMISES AND USE LIMITATION**..................10
    5.1    Permitted Use.............................................................................10
    5.2    Exclusive; Restricted Area..........................................................10
    5.3    Prompt Occupancy and Use........................................................11
    5.4    Tenant's Covenants....................................................................12
    5.5    Prohibited Uses..........................................................................16

**Article VI. ASSIGNMENT, SUBLETTING, AND MORTGAGING**......16
    6.1    Procedures.................................................................................16
    6.2    Intentionally Omitted.................................................................19
    6.3    Further Limitations....................................................................19

**Article VII. RESPONSIBILITY FOR REPAIRS; SERVICES AND UTILITIES**..................19
    7.1    Repairs......................................................................................19
    7.2    Services and Utilities.................................................................21

**Article VIII. TENANT'S SHARE OF OPERATING COSTS**...............22
    8.1    Operating Costs..........................................................................22

**Article IX. REAL ESTATE AND OTHER TAXES**............................24
    9.1    Project Real Estate Taxes............................................................24
    9.2    Initial Responsibility..................................................................24
    9.3    Tenant's Share of Real Estate Taxes............................................24
    9.4    Tenant's Personal Property, Equipment and Other Taxes..............25

**Article X. INDEMNITY AND PUBLIC LIABILITY INSURANCE**......25

10.1    Indemnity ................................................................................................25
10.2    Tenant's Risk ............................................................................................26
10.3    Injury Caused by Third Party ....................................................................26
10.4    Commercial Liability Insurance .................................................................26

**Article XI. LANDLORD'S ACCESS TO PREMISES** ...............................................**27**
11.1    Landlord's Right of Access .......................................................................27

**Article XII. DAMAGE CLAUSE** ...................................................................................**28**
12.1    Partial Damage ........................................................................................28
12.2    Substantial Damage .................................................................................28
12.3    Definitions of "Substantial Damage" and "Substantially Damaged" ...........29
12.4    Damage to Other Portions of the Building, the Project and Uninsured
         Casualty ...................................................................................................29
12.5    Damage During Last Year of Term ...........................................................29
12.6    Abatement of Rent ...................................................................................30

**Article XIII. EMINENT DOMAIN** ..............................................................................**30**
13.1    Rights of Termination for Taking ..............................................................30
13.2    Payment of Award ...................................................................................31
13.3    Abatement of Rent ...................................................................................31

**Article XIV. WAIVER OF SUBROGATION** ..............................................................**31**
14.1    Non-Subrogation .....................................................................................31

**Article XV. HAZARDOUS MATERIALS** ...................................................................**32**
15.1    Hazardous Materials .................................................................................32

**Article XVI. DEFAULT** ................................................................................................**32**
16.1    Events of Default .....................................................................................32
16.2    Right to Terminate ...................................................................................33
16.3    Right of Re-Entry ....................................................................................34
16.4    Right to Relet ..........................................................................................34
16.5    Tenant to Remain Liable ..........................................................................34
16.6    Damages ..................................................................................................34
16.7    Rights Cumulative, Non-Waiver ...............................................................35
16.8    Expenses .................................................................................................36
16.9    Landlord's Right to Cure ..........................................................................36
16.10   Landlord's Default ...................................................................................36

**Article XVII. MISCELLANEOUS PROVISIONS** ......................................................**36**
17.1    Waiver 36
17.2    Covenant of Quiet Enjoyment ..................................................................37
17.3    Limitation of Liability ...............................................................................37
17.4    Force Majeure .........................................................................................38
17.5    Mechanics' and Other Items ....................................................................38
17.6    No Brokerage ..........................................................................................38

| | | |
|---|---|---|
| 17.7 | Invalidity of Particular Provisions | 39 |
| 17.8 | Provisions Binding | 39 |
| 17.9 | Recording | 39 |
| 17.10 | Notices | 39 |
| 17.11 | When Lease Becomes Binding | 39 |
| 17.12 | Paragraph and Section Headings | 40 |
| 17.13 | Rights of Mortgagee | 40 |
| 17.14 | Definition of "Gross Leasable Area" | 41 |
| 17.15 | Estoppel Certificate | 41 |
| 17.16 | Surrender of Premises | 42 |
| 17.17 | Holding Over | 43 |
| 17.18 | Intentionally Omitted | 43 |
| 17.19 | Intentionally Omitted | 43 |
| 17.20 | Governing Law | 43 |
| 17.21 | Intentionally Omitted | 43 |
| 17.22 | Intentionally Omitted | 43 |
| 17.23 | Waiver of Trial By Jury | 43 |
| 17.24 | Business Methods | 44 |
| 17.25 | Tenant Representations | 44 |
| 17.26 | Independent Covenants | 44 |
| 17.27 | Guaranty | 44 |
| 17.28 | Counterparts; Electronic Signatures | 44 |
| 17.29 | Attorney's Fees. | 45 |
| 17.30 | Landlord/Tenant Relationship. . | 45 |

**Article XVIII. SECURITY DEPOSIT** ........................................................**45**
| | | |
|---|---|---|
| 18.1 | Amount of Deposit | 45 |

# LEASE

THIS INSTRUMENT IS AN INDENTURE OF LEASE in which the Landlord and the Tenant are the parties hereinafter named, and which relates to space in the building known as Building A (the "**Building**") in the project known as "SLX Atlanta" located at 5211 Peachtree Boulevard, Chamblee, Georgia.  The parties to this instrument hereby agree with each other as follows:

## ARTICLE I.
## BASIC LEASE DATA, EXHIBITS, AND RIDERS

1.1    Introduction.

The following set forth basic data and identifying Exhibits, and Riders elsewhere hereinafter referred to in this Lease, and, where appropriate, constitute the terms hereinafter listed.

1.2    Basic Data.

DATE OF LEASE EXECUTION:  August _3_, 2022 (the "**Effective Date**")

LANDLORD:  Northland Chamblee LLC, a Delaware limited liability company

MANAGING AGENT:  Northland Investment Corporation

LANDLORD'S/MANAGING AGENT'S ADDRESS FOR NOTICE:

> Northland Investment Corporation
> 2150 Washington Street
> Newton, MA  02462

TENANT:          Qian Yuan Service, LLC d/b/a H&Z Massage

TENANT'S ADDRESS (FOR NOTICE AND BILLING):

> Attn: Yun Zheng
> 5211 Peachtree Boulevard, Suite 1100
> Chamblee, GA 30341

> With a copy to:

> Xiuxiang Zhang
> 4717 Tiger Blvd
> Duluth, GA 30096

TENANT'S TELEPHONE NUMBER:  (470) 618-1995

TENANT'S TRADE NAME:  H & Z Massage

PREMISES:  Suite 1100, containing approximately 2,428 square feet of Gross Leasable Area in the Building as shown on the plan attached hereto as **Exhibit A**.

PROJECT:  As the same may be changed from time to time, the land, the Building, including the Retail Stores and all garages and surface parking areas, and other improvements from time to time constituting the mixed use project now known as "SLX Atlanta" located at 5211 Peachtree Boulevard, Chamblee, Georgia, and depicted on the plan attached hereto as **Exhibit A-1** (the "**Site Plan**").

RETAIL STORES:  As the same may be changed from time to time, the retail stores located in the Project which together currently comprise approximately 23,048 square feet of Gross Leasable Area in the Project.

LEASE COMMENCEMENT DATE:  The Effective Date of this Lease set forth above.

RENT COMMENCEMENT DATE:  The date that is the earlier to occur of (a) the date on which Tenant first opens for business at the Premises, and (b) the date which is one hundred fifty (150) days following the Lease Commencement Date.

EXPIRATION DATE:  The last day of the Term, as the same may be extended as set forth in this Lease.

INITIAL TERM:  The period from the Lease Commencement Date to the last day of the tenth (10th) Lease Year following the Rent Commencement Date; subject to the Options to Extend as hereafter provided.  The Initial Term, as extended by the Options to Extend, is sometimes referred to as "Term"."

OPTIONS TO EXTEND:  One (1) period of five (5) years, as set forth in Section 3.2 below.

MINIMUM RENT:

| Period: | Minimum Rent PSF: | Annual Minimum Rent: |
|---|---|---|
| Lease Year 1 | $67,984.00 | $5,665.33 |
| Lease Year 2 | $67,984.00 | $5,665.33 |
| Lease Year 3 | $70,023.52 | $5,835.29 |
| Lease Year 4 | $72,124.23 | $6,010.35 |
| Lease Year 5 | $74,287.95 | $6,190.66 |
| Lease Year 6 | $76,516.59 | $6,376.38 |

-2-

| Lease Year 7 | $78,812.09 | $6,567.67 |
| Lease Year 8 | $81,176.45 | $6,764.70 |
| Lease Year 9 | $83,611.74 | $6,967.65 |
| Lease Year 10 | $86,120.10 | $7,176.68 |
| For each of Lease Years 11-15 (if applicable) | Continued annual three percent (3%) increases | Continued annual three percent (3%) increases |

PERCENTAGE RENT: Six percent (6%) of annual **Gross Sales** (as herein defined) in excess of an annual dollar amount (the "**Base Gross Sales Figure**") equal to the Annual Minimum Rent payable from time to time, divided by six percent (6%), as more particularly set forth in **Section 4.2**, below.

SECURITY DEPOSIT: $10,000.00

GUARANTOR: Yun Zheng

BROKERS: CBRE and KW Commercial Atlanta Perimeter

TENANT'S PROPORTIONAL SHARE: The percentage which the Gross Leasable Area of the Premises represents of the total gross leasable area of the Retail Stores of the Project from time to time, subject to adjustment under certain circumstances as described in the Lease.

PERMITTED USE: Tenant may use the Premises for a massage studio offering various massage techniques and foot massage, but subject in all respects to all of the terms and provisions of this Lease (the "**Permitted Use**"); provided, however, that the Premises shall not be used for the Restricted Uses or any of the Prohibited Uses set forth in **Exhibit D** attached hereto (Landlord hereby agreeing that the prohibition on a massage parlor will not apply to Tenant so long as Tenant complies with the requirements for such use in **Exhibit D** and the rest of this Lease regarding Tenant's use and operations. Except as provided in this paragraph, the Premises may not be used for any use or purpose without Landlord's prior written approval.

LANDLORD'S CONTRIBUTION: $36,420.00

    1.3    Enumeration of Exhibits.

        The following Exhibits are a part of this Lease, are attached hereto and incorporated herein by reference, and are to be treated as a part of this Lease for all purposes. Undertakings contained in such Exhibits are agreements on the part of Landlord and Tenant, respectively, to perform the obligations stated therein to be performed by Landlord and Tenant, as and where stipulated therein.

-3-

Exhibit A: A plan showing the location and dimensions of the Premises demised to Tenant under this Lease.

Exhibit A-1: A plan showing the Project. Notwithstanding anything to the contrary contained in this Lease, the designation or use from time to time of portions of the Project as common areas shall not restrict Landlord's use of such areas for building, Landlord hereby reserving the right to build structures anywhere upon, and make any use of areas within, the Project, provided accessibility to the Premises and visibility of Tenant's signs are not materially adversely affected.

Exhibit B: Rules and Regulations.

Exhibit B-1: Construction Rules and Regulations.

Exhibit C: Work Letter.

Exhibit D: Restricted Uses and Prohibited Uses.

Exhibit E: Intentionally Omitted

Exhibit F: Intentionally Omitted

Exhibit G: Roof Plan.

Exhibit H: Form of Guaranty

## ARTICLE II.

2.1    Condition of Premises.

Landlord hereby demises and leases to Tenant, and Tenant hereby accepts from Landlord, in "AS IS, WHERE IS" condition, without any obligation on the part of Landlord to prepare or construct the Premises for Tenant's occupancy, and without any representation or warranty by Landlord as to the condition of the Premises or the Building, upon the terms and conditions set forth herein, the Premises. Tenant agrees that by taking possession of the Premises, Tenant formally accepts the same and acknowledges that the Premises are in the condition called for hereunder. Tenant hereby acknowledges that it has relied on its own inspections and due diligence in entering this Lease and not on any representations or warranties of Landlord or any broker or other representative of Landlord concerning the condition or suitability of the Premises or the Project for any particular purpose or any other matter.

2.2    Appurtenant Rights and Reservations.

Tenant shall have, as appurtenant to the Premises, the non-exclusive right in common with others to use and permit its customers to use public or common areas made available to the public generally, including the parking areas, roadways, and sidewalks (if any) in the Project, but such rights shall always be subject to the Rules and Regulations (defined in Section 5.4(h) hereof), and Landlord reserves the right to designate and change from time to time areas and facilities so to be

-4-

used, and to post and enforce time limits for the use of parking spaces. Tenant's employees and customers are not permitted to park in the portions of the Project designated for residential uses, but may use the non-residential parking areas of the Project on an unreserved basis. Tenant agrees that it will, if and when so requested by Landlord, furnish Landlord with the license numbers of any vehicles of Tenant, its respective officers, employees and agents.

Tenant shall have the non-exclusive right to access the access panels in the Building for the HVAC ventilation shaft, exhaust duct and any other shafts, conduits and ducts that Tenant is granted the right to use at reasonable times on reasonable prior notice to Landlord (not less than three (3) business days prior notice with respect to access panels that are located in residential apartments), except in an emergency, subject to reasonable rules and regulations adopted by the Landlord from time to time subject to the provisions of this Section 2.2. Landlord shall provide Tenant with a copy of any such rules and regulations when implemented. Access to the panels shall be coordinated with Landlord as such access may involve access to the premises leased to other tenants (including residential tenants). Landlord and Tenant will agree upon a schedule for Tenant's access for regular cleaning and maintenance of such shafts and ducts and Landlord will facilitate such access. Tenant shall also have the non-exclusive right to access and use those portions of the roof of the Building shown on the plan attached hereto as **Exhibit G** (the "**Roof Plan**") to install, operate, repair, maintain and replace Tenant's rooftop equipment, which rooftop equipment shall be subject to Landlord's prior written approval.

Excepted and excluded from the Premises are all perimeter walls, except the inner surface thereof, the roof or ceiling thereof, except the inner surface thereof, and the floor except the inner surface thereof, but the store front and any exits or openings required from time to time by applicable law or for the use of the Premises are not excluded from the Premises, and are a part thereof for all purposes; and Tenant agrees that Landlord shall have the right to place in the Premises (and in such manner as to reduce to a minimum interference with Tenant's use of the Premises) utility lines, pipes and the like, to serve the Premises or premises other than the Premises, and to replace and maintain and repair such utility lines, pipes and the like, in over and upon the Premises. Landlord reserves the right to maintain, replace and/or repair any such utility lines, pipes and the like in the Premises. Tenant shall install and maintain, as Landlord may require, proper access panels in the hung ceiling in the Premises to any such facilities above the ceiling.

For purposes of this Lease, the term "**Legal Requirements**" shall mean all present and future laws, rules, orders, ordinances, regulations, statutes, requirements, decisions, codes and executive orders of all governmental authorities now existing or hereafter created, and of any and all of their departments and bureaus, and of any applicable fire rating bureau, or other body exercising similar functions, affecting the Project. Without limiting the generality of the foregoing, Legal Requirements shall include any requirements in the certificate of occupancy issued for the Premises or for the Building and the Americans With Disabilities Act of 1990, as the same may hereafter be amended.

-5-

4870-9795-2549, v. 4

## ARTICLE III.
## TERM OF LEASE

3.1    Initial Term.

The Initial Term of this Lease shall be as set forth in Section 1.2.

3.2    Options To Extend.

Tenant shall have one (1) option to extend the Term of this Lease for an additional period of five (5) years (the "**Additional Term**").  The option shall be exercised only by written notice of the exercise of such option (an "**Extension Notice**") delivered by Tenant to Landlord not less than six (6) months and not more than twelve (12) months prior to the expiration of the then-current Term.   Said Extension Notice shall be effective only if given in the timely manner described; however, Tenant's exercise of its option may be deemed void in Landlord's sole discretion if:  (i) the Premises is not open and operated by Tenant for the Permitted Use set forth in Section 1.2 on the date of Landlord's receipt of the Extension Notice and on the date of the expiration of the then-current Term hereof, (ii) an Event of Default exists on the date of Landlord's receipt of the Extension Notice or on the date of the expiration of the then-current Term hereof, or (iii) Tenant has assigned the Lease or sublet any portion of the Premises other than by assignment or subletting permitted without Landlord's consent under Section 6.2 hereof.  Any Additional Term shall be on the same terms and conditions as set forth in this Lease (including Rent for the applicable Additional Term as set forth in Section 1.2 above) and except there shall be no further right to extend with respect to a previously exercised option to extend and there shall be no Landlord Contribution (as defined in **Exhibit C**).  Once the Term is extended in accordance with the provisions of this Lease, any reference in this Lease to the "Term" of this Lease shall mean the Term as extended.  Notwithstanding the fact that, upon Tenant's exercise of an option to extend the Term of this Lease as provided herein, such extension shall be self-executing as aforesaid, if requested by either party, the parties shall promptly execute a lease amendment reflecting such Additional Term after Tenant exercises such option in accordance with the terms of this Lease.  Failure to execute any such lease amendment shall not affect the validity of Tenant's exercise of its right to extend the Term.  Time is of the essence with respect to all provisions of this Section 3.2.

## ARTICLE IV.
## RENT

4.1    Minimum Rent.

Tenant agrees to pay to Landlord, by wire transfer pursuant to wiring instructions provided by Landlord from time to time, monthly, in advance, beginning on the Rent Commencement Date, and thereafter on the first day of each and every calendar month during the Term of this Lease, a sum equal to one-twelfth (1/12th) of the then applicable Annual Minimum Rent specified in Section 1.2 hereof.  Notwithstanding the foregoing, Tenant shall pay to Landlord, simultaneously with the execution and delivery of this Lease by Tenant, an amount equal to $6,903.61, to be applied to the first month installment of Minimum Rent and Additional Rent hereunder.  All Minimum Rent, Additional Rent, including without limitation Percentage Rent, and other monies, charges, and/or

-6-

amounts payable by Tenant to Landlord under this Lease shall be rent and payable and recoverable as rent in a manner herein provided and shall be referred to herein as "**Rent**" or "**rent**." As used herein, "**Additional Rent**" shall mean all Rent payable by Tenant to Landlord under this Lease other than Minimum Rent. Rent shall be paid to the Landlord, without any withholding, offset, reduction, prior notice or demand, except as may be otherwise specifically provided herein. Minimum Rent for any partial month shall be paid by Tenant to Landlord at such rate on a pro rata basis, and if the Rent Commencement Date occurs on a day other than the first day of a calendar month, the Minimum Rent payment for such month shall be the proportionate part of such monthly Minimum Rent for the partial month from the Rent Commencement Date to the first day of the succeeding calendar month.

Tenant may make payments of Rent and other charges by electronic payment using an Automated Clearing House ("**ACH**") system, or other similar system. Landlord shall provide Tenant with required forms and information necessary for such ACH payments.

Other items of Rent payable by Tenant shall be paid on a monthly basis unless otherwise specified herein, as hereinafter provided, shall likewise be prorated for any such partial month, and the first payment on account thereof shall be determined in similar fashion; and other provisions of this Lease calling for monthly payments shall be read as incorporating this undertaking by Tenant.

If Tenant shall fail to pay any Rent when due, such unpaid amounts shall bear interest until paid at the rate of one percent (1%) per month. In the event Tenant pays any Rent by check or draft, and said check or draft is not honored by the bank on which it is drawn, an additional charge of $150.00 shall be due from Tenant to Landlord upon demand..

4.2    Percentage Rent.

In addition to the Minimum Rent, and as part of the total rent, Tenant agrees to pay to Landlord, at the place at which Minimum Rent is payable, as rent for each Lease Year of the term hereof, Percentage Rent as defined in Section 1.2.

For any Lease Year during which the Minimum Rent payable under this Lease is abated or reduced for any reason whatsoever to a sum which is less than twelve (12) times the monthly installment rate of Minimum Rent as specified in Section 1.2, the Base Gross Sales Figure shall be reduced in the same proportion which the amount of Minimum Rent payable hereunder for any Lease Year bears to the Minimum Rent stated as payable for such Lease Year under the terms of this Lease.

Tenant shall pay to Landlord as Percentage Rent for each Lease Year, the amount specified in Section 1.2, except as otherwise set forth in this Lease. If Percentage Rent was paid in the previous Lease Year, then for each subsequent Lease Year, Tenant shall pay in monthly installments one twelfth of the Percentage Rent paid in the previous Lease Year. Within sixty (60) days after the end of the Calendar Year, Tenant shall notify Landlord of the Gross Sales during the just completed Calendar Year and the amount of Percentage Rent for the just completed Lease Year. Tenant shall pay any deficiency in the Percentage Rent paid to Landlord when notifying the Landlord of the Gross Sales for the just completed Lease Year. If Percentage Rent was not paid

-7-

for the previous Lease Year, then Tenant shall pay the Percentage Rent due, if any, when it notifies Landlord of the Gross Sales during the just completed Lease Year. If the aggregate of the monthly installments of Percentage Rent paid during the Lease Year exceeds the amount of Percentage Rent due for the Lease Year, then the overdue amount shall be credited against Tenant's next payment of Percentage Rent, Minimum Rent and all other rent due. In the event that the Premises are not continuously open for business, in accordance with Section 5.3, during any Lease Year, the base amount used in calculating Percentage Rent as set forth in Section 1.2 shall be reduced to any amount equal to such base amount multiplied by a fraction, the numerator of which shall be the number of days during the Lease Year during which the Premises have been continuously open for business, and the denominator of which shall be the number days Tenant should have been open for business pursuant to Section 5.3. In the event that a Lease Year is less than twelve full calendar months, (hereinafter referred to as **"Shortened Lease Year"**) the base amount used in calculating Percentage Rent as set forth in Section 1.2 shall be reduced to an amount equal to such base amount multiplied by a fraction, numerator of which shall be the number of months during the shortened Lease Year and the denominator which shall be twelve.

Should Landlord permit Tenant to assign this Lease or sublet the Premises, then the Percentage Rent payable for each remaining months of the Lease Term shall be the greater of (a) the Percentage Rent calculated pursuant to Section 1.2 hereof, or (b) the average monthly Percentage Rent paid by Tenant for the last twelve months of continuous business operations conducted by Tenant immediately preceding such assignment or subletting.

(a)    Lease Year. To the extent the First Lease Year is longer than 12 months, the Base Gross Sales Figure set forth in Section 1.2 shall be increased by 1/365 of the amount described therein for each day of the longer first Lease Year.

(b)    Definition of Gross Sales. The term **"Gross Sales"** as used herein is defined to mean the total amount in dollars of the actual sales price, whether for cash, on credit by charge account, exchange or otherwise or any combination of the foregoing, of all sales of merchandise and services and all other receipts of business conducted in or from the Premises (including the value of goods accepted in lieu of cash payment), all deposits not refunded to purchasers, all orders taken in and from the Premises, whether or not said orders are filed elsewhere, receipts of sales by any sublessee, concessionaire, licensee and any other person or persons all display fees, slotting allowances, promotional considerations, rebates or other payments received by Tenant to stock, promote or advertise any product. Gross Sales shall not, however, include any sums collected and paid out by Tenant for any sales tax or retail excise tax imposed by any duly constituted governmental authority provided such retail excise tax is independently added to the merchandise price by Tenant at point of sale and separately collected by Tenant (at the counter), or any exchange of goods or merchandise between stores of Tenant where such exchange of goods or merchandise is made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which has theretofore been made at or from the Premises, or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at or from the Premises, or the amount of returns to shippers or manufacturers, or the amount of cash or credit refund or exchange made upon sale provided such sale was originally included in Gross Sales, or sales of fixtures which are not part of Tenant's stock in trade. Each sale upon installment or credit shall be treated as a sale for the full price in the month during which such sale shall be made,

-8-

irrespective of the time when Tenant may receive payment from its customers. Gift certificates shall be included in Gross Sales when issued.

(c)     Maintenance of Records and Examination. Tenant shall utilize, and cause to be utilized, cash registers to record all Gross Sales, and Tenant shall keep, for at least thirty six (36) months after the expiration of each Lease Year sufficient records conforming to Tenant's usual accounting practices, showing all of the Gross Sales at or from the Premises for such Lease Year, including all tax reports, bank deposit records and other supporting data. Within twenty (20) days after the end of each calendar month, or portion thereof included in the Lease Term, Tenant shall furnish Landlord at the place rent is payable, a statement of Tenant's Gross Sales during such month or portion thereof; and, on or before sixty (60) days from the close of each Lease Year included in the Lease Term, and within thirty (30) days after the end of the Lease Term, Tenant shall furnish Landlord a statement, hereinafter called the "**annual statement**", certified by Tenant's chief executive or chief financial officer, of Tenant's Gross Sales during the preceding Lease Year. The acceptance by Landlord of payments of Percentage Rent or reports herein described shall in no event constitute a waiver of Landlord's right to claim a deficiency in the payment of Percentage Rent or to audit Tenant's books and records as herein provided. Landlord shall have the right from time to time by its accountants or representative to audit all annual statements of Gross Sales and, in connection with such audits, to examine all of Tenant's records (including all supporting data) of Gross Sales disclosed in annual statement given to Landlord by Tenant; and Tenant shall make all such records readily available for such examination and shall keep and maintain for a period of not less than three years complete and accurate books of accounts and records of all transactions from which Gross Sales is determined. If upon examination or audit Landlord's accountant or representative determines that sufficient documentation is not maintained, retained, recorded, or available to verify Tenant's actual Gross Sales, Tenant shall pay for the cost of such visit, and in addition, should Landlord deem it necessary, Tenant shall reconstruct, at its sole cost and expenses, all records for the determination of Gross Sales of Tenant for any period being audited. If such reconstruction of records, in Landlord's determination, are inadequate to disclose such Gross Sales, Landlord shall be entitled to collect as Additional Rent an amount equal to 5% of the annual Minimum Rent payable by Tenant during the period in question. Without abrogating Landlord's other rights, if any such audit discloses that the actual Gross Sales by Tenant exceeded those reported by Tenant, in addition to paying the amount of any deficiency, Tenant shall also pay the cost of such audit and examination if the amount of Gross Sales reported was understated by more than four percent (4%). If the amount of Gross Sales reported was understated by more than four (4%), or if Tenant fails to submit any statement of Gross Sales called for under this Lease (after written notice by Landlord), Landlord may, at its option and in addition to any other remedy provided hereunder or by law, terminate this Lease upon written notice of termination to Tenant, or cause an audit to be performed to prepare such report for Tenant at Tenant's cost. The findings of Landlord's accountants or representation shall be binding and conclusive upon the parties hereto. All costs mentioned herein are collectible as Additional Rent.

(d)     Percentage Rent Computed on Year to Year Basis. Computation of the Percentage Rent specified herein shall be made separately with regard to each Lease Year of the term hereof, it being agreed that the Gross Sales of any Lease Year and the Percentage Rent due thereon shall have no bearing on, or connection with, the Gross Sales of any other Lease Year of the Term hereof. It is agreed that Landlord shall never be treated as a partner or associate of

-9-

Tenant's conduct or Tenant's business or otherwise; but it is understood and agreed that the relationship is and at all times shall remain that of Landlord and Tenant.

4.3    Lease Year.

As used in this Lease, the term **"Lease Year"** means a period of twelve (12) consecutive calendar months, beginning with the first day of the first full month of the Rent Commencement Date and ending on the last day of the twelfth (12th) month thereafter, except that if the Rent Commencement Date is other than the first day of a month, the first Lease Year of the Term shall also include the short period commencing on the Rent Commencement Date to the first day of the month following the Rent Commencement Date.

## ARTICLE V.
## USE OF PREMISES AND USE LIMITATION

5.1    Permitted Use.

Tenant agrees that the Premises shall be used and occupied by Tenant or any occupant rightfully claiming under Tenant only for the purpose specified as the use thereof in Section 1.2 hereof, subject to the limitations contained therein, and for no other purpose or purposes. Notwithstanding anything to the contrary contained in this Lease, this Lease and Tenant's use of the Premises shall be subject to all matters of record applicable to the Premises or the Project as of the date of this Lease and to all matters of record hereafter recorded and affecting the Property provided that any such future matters of record to which this Lease is subject and subordinate shall not adversely affect Tenant's rights, remedies or obligations under this Lease in any material way. Other than the Permitted Use, Tenant shall not use, or permit the use of, the Premises for any use (including those uses set forth in **Exhibit D** attached hereto) for which an exclusive is granted in the Project from and after the date Landlord notifies Tenant in writing that such exclusive has been granted.   Landlord shall not permit any portion of the Project to be used for any of the Prohibited Uses.

5.2    Exclusive; Restricted Area.

(a)    As a material inducement to Tenant to enter into this Lease, but subject to the provisions of this Section 5.2, Landlord hereby agrees ("**Exclusive Agreement**") that, from and after the Effective Date, provided that Tenant shall continuously operate its business in the Premises and is not in default under this Lease beyond any applicable cure period allowed herein, Landlord shall not enter into any lease, license or other occupancy agreement or permit the occupancy in any way (including by way of consenting to or permitting an assignment or sublease of a lease at the Project) of space at the Project with or to any tenant or occupant (other than Tenant) for the primary use (the "**Exclusive Use**") of a massage studio, whereby such massage use represents more than fifteen percent (15%) of the revenue as its primary use.  Notwithstanding the foregoing or anything to the contrary contained in this Lease, the Exclusive Agreement shall not apply to medical/sports massage offered at chiropractor offices, physical therapists, or other health care providers subject to reimbursement from health care plans.    Additionally, the Exclusive Agreement shall not apply to any tenant leasing space at the Project whose lease was executed prior to the date of this Lease and such tenants' subtenants, successors and assigns and any renewal,

-10-

assignment or replacement of said lease or the premises occupied by such parties, provided that Landlord shall not give its consent (where such consent is required) for any such tenant or successor tenant to change the use of its premises in the Project to a use which would violate the Exclusive Agreement. If any other tenant or occupant within the Project violates the provisions of the Exclusive Agreement, without any fault on the part of Landlord, then Landlord shall have no obligation or responsibility in connection therewith; provided, however, that Landlord will cooperate with Tenant (without expense to Landlord) to enjoin any such violation. If any third party or a federal, state or local governmental body or agency threatens or commences an investigation, inquiry, proceeding or action against Landlord and/or Tenant arising out of, directly or indirectly, the limitation granted hereunder, then Tenant at its own cost and expense, shall defend and save Landlord harmless from and against all loss, claims or damages (including reasonable attorneys' fees) resulting therefrom. The Exclusive Agreement shall become effective on the Effective Date and shall terminate and expire (i) if the Premises is not used, on and after the Rent Commencement Date, for the Permitted Use for more than ninety (90) consecutive days, or (ii) upon the occurrence of an Event of Default.

(b)    Notwithstanding anything set forth in this Lease to the contrary, Landlord shall have no liability hereunder, and Tenant shall have no claim against Landlord or right to a reduction in Rent, where a business engages in the Exclusive Use without the consent of the Landlord, so long as Landlord uses good faith diligent efforts to cause such business to cease use of its premises for the Exclusive Use.

(c)    In consideration of Landlord's granting to Tenant the Exclusive Agreement, Tenant covenants and agrees (insofar as and to the extent that it is lawful so to agree) that for the period commencing with the Effective Date and continuing for the full Term of this Lease, as it may be extended, none of the Tenant, the Guarantor, any principal of or partner in the Tenant, any of their affiliated, parent or subsidiary companies, or any franchisor (or licensor) or any franchisee (or licensee) of any of them, will operate, either directly or indirectly, another massage studio using Tenant's Trade Name and operating for the Permitted Uses within a radius area of three miles around the Premises (the **"Restricted Area"**). Tenant acknowledges that the Restricted Area is a reasonable area for this purpose. If Tenant violates this Section 5.2(c), without limiting Landlord's other rights and remedies for such default, the Exclusive Agreement shall be deemed null and void; provided, however, the Exclusive Agreement shall be re-instated once Tenant cures the violation of the Restricted Area.

5.3    Prompt Occupancy and Use.

Subject to Force Majeure, Tenant shall open for business, fully staffed and stocked, in the Premises no later than one hundred fifty (150) days following the Lease Commencement Date and thereafter continuously operate and conduct business in the Premises for the Permitted Use in accordance with the requirements of this Lease, using a sufficient number of adequately trained managers and personnel for efficient service, and Tenant shall keep the Premises open for business Monday to and including Friday of each week from at least 10:00 A.M. to 9:00 P.M.; all subject to temporary closings as specified by Landlord on account of casualty or to applicable municipal ordinances of the City of Chamblee and other Legal Requirements. Tenant's business in the Premises shall be conducted under the Trade Name set forth in Section 1.2 unless another name is

-11-

previously approved in writing by Landlord and in such manner as shall assure the transaction of a maximum volume of business in and at the Premises. Landlord reserves the right to alter the hours of operation of the Project from time to time if required by applicable Legal Requirements. Notwithstanding the foregoing in this <u>Section 5.3</u>, Tenant shall not be deemed to have violated the requirements of this <u>Section 5.3</u> in the event Tenant temporarily discontinues operations in the Premises for such periods as may be necessary due to (i) casualty, taking, or renovation of the Premises, or (ii) Tenant's moving out of, and the Tenant's assignee's moving into, the Premises pursuant to an authorized assignment of the Tenant's interest in accordance with the terms of this Lease and for a period not in excess of one (1) month (collectively "**Permitted Closures**"). In addition, Tenant may close its business on Thanksgiving Day, Christmas Eve, Christmas Day, New Year's Eve, New Year's Day, Easter Sunday, and on such other legal holidays as the majority of other tenants in the Retail Stores (which majority must include the tenant leasing the greatest amount of gross leasable area of the Retail Stores) are also closed.

In the event Tenant shall cease to operate its business in the Premises for more than ninety (90) consecutive days, except for Permitted Closures and subject to Force Majeure, Landlord shall have the right, at any time thereafter, for as long as Tenant's cessation to operate is still in effect, to terminate this Lease by giving Tenant thirty (30) days written notice and if Landlord shall make such election, then this Lease shall terminate thirty (30) days after receipt by Tenant of Landlord's written notice unless Tenant has reopened the Premises for business in a bona-fide manner during such thirty (30) day period.

5.4    <u>Tenant's Covenants</u>.

Tenant further agrees to conform to the following provisions during the entire Term of this Lease:

(a)    No auction, fire, distress or bankruptcy sales may be conducted within the Premises without the prior consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion.

(b)    Tenant shall not use any portion of sidewalks adjacent to the Premises for any purpose whatsoever except for access and egress and except as otherwise expressly permitted in this Lease.

(c)    Tenant shall ensure that all deliveries to and from the Premises shall be made only via areas designated by Landlord and only between the hours of 9:00 a.m. to 6:00 p.m. on Mondays through Saturdays and 9:00 a.m. to 1:00 p.m. on Sundays.

(d)    Except as otherwise permitted in this Lease, Tenant will not place on the exterior walls or on the windows (both interior and exterior) of the Premises, or in any part of the Building or Project outside of the Premises, any signs, or any symbol, advertisement, neon light, other light, or other object or thing visible to public view outside of the Premises without the express prior written consent of Landlord, provided, however Tenant shall be permitted to install signage, including "Coming Soon" and "Grand Opening" banners, on the façade of the Premises (the "**Tenant's Signage**") in accordance with, and as permitted by, applicable Legal Requirements, the size, location, method of installation and design of which must be approved by Landlord prior

-12-

to installation, such approval not to be unreasonably withheld, conditioned or withheld. Subject expressly to (i) all applicable Legal Requirements, and (ii) Landlord's prior written consent, not to be unreasonably withheld, conditioned or delayed, Tenant shall be permitted to install, in a neat and well-kept manner, professionally manufactured signs and merchandise on the inside of its windows for display purposes in accordance with the Signage Guidelines. Landlord may require Tenant to remove such signs or merchandise if the same are not properly maintained or are displayed in an offensive manner or contrary to the Signage Guidelines or applicable Legal Requirements. Landlord shall cooperate with Tenant in connection with Tenant's efforts to obtain any necessary approvals for such exterior signage and shall cooperate with Tenant, subject to the Signage Guidelines, with changes to Tenant signage necessary to secure approvals from the City of Chamblee. Landlord shall not charge any fees to the Tenant in connection with such cooperation.

(e)     Tenant shall not perform any act or carry on any practice which may damage the Premises or any other part of the Building or Project, or overload the floors or walls beyond design loads identified by Landlord or otherwise applicable to the Tenant Work or cause any offensive odor or objectionable noise or vibration, or constitute a nuisance or a menace to any other tenant or tenants or other persons in the Building or Project, or dispose of Hazardous Materials (hereinafter defined) on or from the Premises, the Building or the Project. In the event that sound from activities or uses within the Premises exceeds NC25 measured three (3) feet from the floor of the occupied space(s) directly above or adjacent to the Premises (the "**Acoustical Mitigation Level**") then Tenant shall, at its sole cost and expense, promptly install such mitigation measures or treatments as are necessary to reduce such sound below the Acoustical Mitigation Level. The foregoing Acoustical Mitigation Level shall not be applicable during the performance of the Tenant Work.

(f)     Tenant shall at all times appropriately light, heat and air-condition the Premises at its sole cost and expense; and Tenant shall keep the Premises in the condition described in Article VII. Without limiting the generality of the foregoing, Tenant at all times shall keep the Premises in a clean and sanitary condition, in compliance with all orders and standards of all regulatory bodies governing Tenant's business operation and the Rules and Regulations.

(g)     Tenant shall not make any alterations in or additions ("**Alterations**") to the Premises that are structural or that affect base building systems, without the prior written consent of Landlord, which Landlord may withhold in its sole and absolute discretion. Tenant may make any non-structural Alterations to the interior of the Premises it desires to make provided that (i) the same are not visible from the exterior of the Premises, (ii) the same are in accordance with all applicable Legal Requirements and performed in a good and first-class workmanship manner, (iii) such changes do not affect any base building or other common systems of the Building, and (iv) Tenant provides written notice of such alterations and a detailed description thereof at least thirty (30) days prior to commencing same; provided, however, that no notice to Landlord is required for so-called "cosmetic" Alterations (such as paint, flooring, and shelving) that do not require a building permit. If any structural or nonstructural Alterations made by or on behalf of Tenant violate any applicable Legal Requirements or insurance company requirements, Tenant shall, at its own cost, make any necessary change to ensure that such Alterations comply with said Legal Requirements or insurance company requirements. Prior to making any Alterations hereunder,

-13-

Tenant shall provide plans and specifications and the licensed contractor to be used by Tenant for such work for Landlord's approval. Tenant shall be responsible for and shall pay to Landlord, as Additional Rent, the entire amount of any real estate taxes separately attributable to (and documented to Tenant) any Alterations made by Tenant pursuant to this Section 5.4(g). Tenant agrees that it will not, either directly or indirectly, use any contractors and/or materials if their use will create any difficulty, whether in the nature of a labor dispute or otherwise, with other contractors and/or labor engaged by Tenant or Landlord or others in the construction, maintenance and/or operation of the Building or any part thereof. All Alterations or other work in the Premises by Tenant shall be subject to the Construction Rules and Regulations attached hereto as **Exhibit B-1**, as same may be amended from time to time by Landlord. Unless an amendment to the then existing Construction Rules and Regulations shall be required by a governmental authority, any amendment to the Construction Rules and Regulations shall not be applicable to any Alterations which have been commenced (which shall mean that an application has been filed for a building permit or plans have been submitted for bids for a construction contract for any proposed work) by Tenant based upon the previously existing Construction Rules and Regulations if such amendment would have an adverse effect (which shall include, without limitation, any material increase in the cost of the work to be undertaken by Tenant) on Tenant's work then being undertaken. Landlord shall provide Tenant with a copy of any amended Construction Rules and Regulations and, after such receipt, except as heretofore provided, Tenant shall be subject to the Construction Rules and Regulations, as amended.

(h)     Tenant agrees to abide by and conform to reasonable rules and regulations as promulgated and/or modified from time to time by Landlord, of which Tenant has been given prior written notice (the **"Rules and Regulations"**). The Rules and Regulations, in present form, are set forth in **Exhibit B** attached hereto and made a part hereof. Landlord shall enforce all Rules and Regulations in a uniform and non-discriminatory fashion, as applicable, with respect to all retail tenants and the residential tenants. In the event of any conflict between the terms of this Lease and any of the Rules and Regulations, the terms of this Lease shall prevail and control.

(i)     Tenant agrees to keep the Premises equipped with all safety appliances required by law or ordinance or any other regulation of any public authority because of any use made by Tenant and to procure all licenses and permits so required because of such use and, if requested by Landlord, to do any work so required because of such use, it being understood that the foregoing provisions shall not be construed to broaden in any way Tenant's Permitted Use.

(j)     Tenant shall cause all freight to be delivered or removed and all trash, refuse, and the like, to be removed at Tenant's expense on a daily basis, in accordance with reasonable rules and regulations established by Landlord therefor. Tenant shall also keep the Premises free of pests and vermin and shall exterminate the Premises at least monthly (or more often if required by health codes or the condition of the Premises). Tenant shall keep all trash, refuse, and the like in the Premises suitably covered and/or contained in leakproof containers which are neither visible to the public nor freely piled until removed to the area of the Building designated for trash disposal (the **"Trash Room"**); removal shall be daily to prevent any accumulations. All trash, refuse and the like shall be disposed of as required by applicable Legal Requirements. Tenant agrees to reasonably cooperate with Landlord, at no substantial out-of-pocket cost to Tenant, in any recycling programs instituted by Landlord or required by applicable

-14-

Legal Requirements, provided, however, Tenant shall not be required to participate in any program maintained by the Landlord to recycle cardboard, bottles or cans or organic waste as long as Tenant maintains its own recycling program. Landlord shall maintain the Trash Room at Landlord's sole cost and expense, and the costs thereof shall be included in Operating Costs.

        (k)      Subject to Tenant's right to use the Premises for the Permitted Use, Tenant covenants and agrees that Tenant will not do or permit anything to be done in or upon the Premises, or bring in anything or keep anything therein, which shall increase the rate of insurance on the Premises, the Building or on the other buildings located in the Project above the standard rate applicable thereto; and Tenant further agrees that in the event that Tenant shall do any of the foregoing, Tenant will promptly pay to Landlord, within thirty (30) days following demand and receipt of documentation that Tenant's actions caused such increase, any such increase resulting therefrom which shall be due and payable as Additional Rent hereunder.

        (l)      Tenant shall not violate the provisions of **Exhibit D**.

        (m)      In connection with Tenant's operations, Tenant shall:

        i.      maintain customer queues and waiting areas for service wholly within the Premises so as to prevent such queues from entering the common areas of the Building or sidewalks adjacent to the Building;

        ii.      take all reasonable steps that may be necessary to minimize noise coming from any of its operations, agents, employees, or patrons (whether such noise comes from the Premises or outside the same);

        iii.      notify Landlord at least 48 hours in advance of any promotions by Tenant likely to generate unusual traffic in, or to, the Premises;

        iv.      ventilate the Premises in a manner such that odors from the Premises, including, without limitation odors associated with Tenant's nail and salon operations, do not permeate other premises in the Building or common areas. Tenant shall ensure that such equipment is inspected in accordance with applicable laws, and that the written reports prepared after such inspections are promptly provided to Landlord upon receipt by Tenant;

        v.      comply with all applicable health codes and promptly address any violations of the same; and

        vi.      immediately take any steps that Landlord shall reasonably require in order to ensure compliance with the foregoing provisions, and in the event that Landlord determines that Tenant has failed immediately to comply in any respect with the foregoing provisions following oral notification of such failure to the store manager or other employee of Tenant on duty at the time of such notice, without limiting all other available rights and remedies of Landlord available under this Lease or at law, Landlord shall have the right, but not the obligation, to take such steps as it determines necessary or appropriate to remedy such failure and Tenant agrees to pay to Landlord the costs thereof promptly following demand therefore.

-15-

5.5    Prohibited Uses.

The Prohibited Uses as defined and set forth in Section 2 of **Exhibit D** shall be prohibited within all or the applicable portions of the Project, as more particularly set forth on **Exhibit D** (the "**Prohibited Uses**") and Landlord shall not lease any portion of the Project for any of the Prohibited Uses. It is the intent of this Section 5.5 that the Project shall be devoted to high quality retail and mixed-use purposes. Notwithstanding the foregoing, such Prohibited Uses shall not apply to existing tenants in the Project (or their respective assignees, subtenants or licensees) who are not subject to such Prohibited Uses pursuant to their respective leases, or any renewals or extensions thereof, provided, however, if Landlord has the right to approve or consent to a change of use thereunder in connection with an amendment, renewal, extension, assignment, subletting or otherwise, Landlord shall enforce the foregoing restrictions in exercising such right, unless withholding such consent would be an express violation of Landlord's obligations under such lease.

## ARTICLE VI.
## ASSIGNMENT, SUBLETTING, AND MORTGAGING

6.1    Procedures.

(a)    Except as otherwise provided in this Article VI, Tenant will not, by operation of law or otherwise, assign, mortgage or encumber this Lease, or sublet or permit the Premises or any part thereof to be used by others, without Landlord's prior express written consent in each instance subject to and in accordance with this Article VI. The consent by Landlord to any assignment or subletting shall not in any manner be construed to relieve Tenant from obtaining Landlord's express written consent to any other or further assignment or subletting nor shall any assignment or subletting, with or without consent by Landlord, serve to relieve or release Tenant from its obligations to fully and faithfully observe and perform all of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed. Any such purported assignment, sublease, or other transfer made without Landlord's consent shall be void. In no event shall Tenant have a claim and Tenant hereby waives the right to any claim against Landlord for money damages by reason of any refusal, withholding, or delaying by Landlord of any consent to such sublease or assignment of this Lease.

(b)    If Tenant shall desire to assign this Lease or to sublet all or substantially all of the Premises, Tenant shall give notice thereof (a "**Proposed Transfer Notice**") to Landlord including (i) the name of the proposed assignee or subtenant; (ii) the terms and conditions of the proposed assignment or subletting; (iii) the nature and character of the business and creditworthiness of the proposed assignee or subtenant; (iv) whether or not the assignee or subtenant will re-use in any material way the leasehold improvements existing in the Premises; and (v) any other information and/or documentation reasonably requested by Landlord. Upon receipt of such Proposed Transfer Notice, notwithstanding anything to the contrary contained herein, Landlord shall have the option, to be exercised within thirty (30) days from receipt of Tenant's Proposed Transfer Notice (the "**Response Period**"), to cancel and terminate this Lease as of the date proposed by Tenant for such assignment or subletting, and thereupon the term of this Lease shall cease and expire with the same force and effect as if such date were originally provided

-16-

herein as the expiration of the Term. Notwithstanding the foregoing, if Tenant shall elect, by written notice to Landlord within ten (10) days after receipt of Landlord's notice of termination, to rescind Tenant's Proposed Transfer Notice, then Landlord's termination and Tenant's Proposed Transfer Notice shall be deemed void and of not further force or effect.

(c)    If Landlord does not elect to exercise its foregoing option to terminate this Lease, Landlord shall, within the same the Response Period, provide Tenant written notice of its approval or disapproval of the proposed transaction in accordance with the terms and conditions of this Article VI. Landlord's consent to any such proposed assignment or subletting shall not be unreasonably withheld, provided, however, that Landlord may withhold consent thereto if in the exercise of its sole judgment it determines that:

i.    The financial condition or general reputation of the proposed assignee or subtenant is not consistent with the extent of the obligations undertaken by the proposed assignment or sublease (without limiting the foregoing, the proposed assignee or subtenant must have a net worth at least equal to the net worth of Tenant as of the date hereof or immediately prior to the assignment or sublease in question, whichever is greater, as evidenced by financial information submitted and reasonably acceptable to Landlord);

ii.    The proposed use of the Premises is not in keeping with the character of the existing tenancies of the Building or permitted by Section 1.2 of this Lease;

iii.    The nature of the occupancy of the proposed assignee or subtenant will cause an excessive density of employees or traffic or make excessive demands on the Building's services or facilities or in any other way will lessen the character of the Building;

iv.    Tenant proposes to assign or sublet to (i) one who at the time is a tenant or occupant of premises in the Building, (ii) one with whom Landlord or its agents are actively negotiating for space in the Building, or (iii) one with or to whom Landlord or its agents have negotiated for or otherwise shown space in the Building during the six (6) month period immediately preceding Tenant's request for Landlord's consent;

v.    Tenant proposes to assign or sublet all or a portion of the Premises at a rental rate less than the rental rate Landlord is then asking for other space in the Building;

vi.    Landlord has space available in the Building to lease to the proposed assignee or subtenant; or

vii.    The Premises will be subdivided as part of or in connection with the proposed sublease.

In no event shall Tenant publicly advertise (as opposed to list with brokers) all or any portion of the Premises for assignment or sublease at a rental less than the rental then sought by Landlord for a direct lease (non-sublease) of a comparable space in the Building.

(d)    Each such permitted sublease shall expressly be made subject to the provisions of this Lease and shall be subject to the review and approval of Landlord in accordance

-17-

with the terms of this Section VI.  If Tenant assigns any of its rights and interests under this Lease, the assignee under such assignment shall expressly assume all of the obligations of Tenant hereunder in a written instrument reasonably satisfactory to Landlord at the time of such assignment.  No assignment or sublease shall impose any obligations on Landlord or otherwise affect any of the rights of Landlord under this Lease nor shall it affect or reduce any of the obligations of Tenant or any Guarantor hereunder, and all such obligations shall continue in full effect as obligations of a principal and not as obligations of a guarantor or surety to the same extent as though no assignment of subletting had been made.

(e)    It is agreed that if Landlord shall not exercise its option to terminate this Lease, does consent to such assignment or subletting and Tenant shall assign this Lease or sublease the Premises for rent or other consideration actually received by Tenant that is in excess of the rent payable hereunder for the whole Premises or in the case of a partial sublease in excess of the rent allocable to that portion of the Premises, after first deducting upfront all reasonable transaction costs actually incurred by Tenant relating to such assignment or sublease including but not limited to brokers' fees, attorneys' fees, free rent and the cost of improvements or alterations made by Tenant expressly and solely for the purpose of preparing that portion of the Premises for such assignment, Landlord shall be entitled to receive fifty (50%) percent of all such excess rent or other consideration actually received by Tenant.  Such Additional Rent payment shall be made monthly within ten (10) days after actual receipt of the same by Tenant.  At the time of submitting the proposed assignment or sublease to Landlord, Tenant shall certify to Landlord in writing whether or not the assignee or subtenant has agreed to pay any monies to Tenant in consideration of the making of the assignment or sublease other than as specified and set forth in such instruments, and if so Tenant shall certify the amounts and time of payment thereof in reasonable detail.  Tenant shall, as a condition of Landlord's review of such assignment or sublease, and whether or not Landlord shall consent thereto, reimburse Landlord's actual out of pocket costs and expenses for such review, which shall not exceed the sum of $2,000 provided that Tenant shall execute and deliver Landlord's standard form of consent. No assignment or sublease shall be binding on Landlord unless, as hereinbefore provided, such assignee, sublessee or Tenant shall deliver to Landlord such duplicate original and shall obtain from Landlord the aforesaid written consent prior thereto. Any assignment, sublease or agreement permitting the use and occupancy of the Premises to which Landlord shall not have expressly consented in writing shall be deemed null and void and of no force and effect.

(f)    If this Lease shall be assigned, or if the Premises or any part thereof be sublet or occupied by any person or persons other than Tenant, Landlord may, after an Event of Default by Tenant, collect rent from the assignee, subtenant or occupant and apply the net amount collected (which may be treated by Landlord as rent or as use and occupancy) to the rent herein reserved, but no such assignment, subletting, occupancy or collection of rent shall be deemed a waiver of the covenants in this Article nor shall it be deemed acceptance of the assignee, subtenant or occupant as a Tenant, or a release of Tenant from the full performance by Tenant of all the terms, conditions and covenants of this Lease.

(g)    Each permitted assignee shall assume and be deemed to have assumed this Lease and shall be and remain liable jointly and severally with Tenant for the payment of the rent, Additional Rent and adjustments of rent, and for the due performance of all the other terms,

-18-

covenants, conditions and agreements herein contained on Tenant's part to be performed for the Term of this Lease.

(h)    Neither this Lease nor the Term shall be mortgaged, pledged or encumbered by Tenant, nor shall Tenant mortgage, pledge or encumber the interest of Tenant in and to any sublease of the Premises or the rental payable thereunder, without the prior written consent of Landlord, which consent may be granted or withheld in the sole discretion of Landlord, and Tenant shall not allow or permit any transfer of this Lease or any interest hereunder by operation of law. Any such mortgage, pledge, encumbrance, sublease or assignment made in violation of this Section 6.1(h) shall be void.

6.2    Intentionally Omitted.

6.3    Further Limitations.

In no event, except for a permitted transfer pursuant to Section 6.2, shall Landlord be obligated to consider any proposed assignment or subletting if (i) at the time of proposal of assignment or subletting, Tenant is in default under the terms hereof beyond applicable notice and cure periods, or (ii) any of Landlord's then mortgagees to whom this Lease is assigned or who shall otherwise have rights to do so shall fail to consent. [Franchisor shall be obligated to cure any monetary default of Tenant in connection with any Permitted Transfer under Section 6.2 for which Landlord has provided notice to Franchisor within the prior ninety (90) days prior to the requested assignment.]

## ARTICLE VII.
## RESPONSIBILITY FOR REPAIRS; SERVICES AND UTILITIES

7.1    Repairs.

Other than as provided elsewhere in this Lease, Landlord agrees to keep in good order, condition and repair, the structural elements of the Building and the Project, including the roof and roof membrane, foundation (including slab and footings), load-bearing walls, façade, exterior windows and glass except as provided in (a) below, and the Building mechanical, electrical, plumbing, fire life safety and other systems that provide service to the Premises (but not to Tenant's heating, ventilation and air conditioning systems serving the Premises, and the internal distribution elements of other building systems exclusively serving the Premises) and Building tenants in general and the common areas of the Building and the Project including all landscaping and surface parking areas, consistent with the standards of similar mixed use developments in the Greater Atlanta area, except:

(a)    any glass or doors in the Premises and the so-called storefront whether or not constructed by Landlord;

(b)    subject to the waiver of subrogation provisions of this Lease, any condition in the Premises caused by any act of neglect of Tenant, any subtenant or assignee, or any employees, agents, licensees, contractors or invitees of Tenant; and

-19-

      (c)      any repairs which are the responsibility of Tenant under this <u>Section 7.1</u>.

Landlord's obligations shall include repair and maintenance of the sidewalks of the Project and for snow and ice removal from the common areas of the Project.

Without limitation, Landlord shall not be responsible for the making of any improvements or repairs in the Premises other than as expressly in this <u>Section 7.1</u>, except for repairs for which Landlord expressly may be responsible under the terms of other provisions of this Lease dealing with fire, casualty or eminent domain. Further, Landlord shall never be liable for any failure to make repairs to the Premises which, under the provisions of this <u>Section 7.1</u> or elsewhere in this Lease, Landlord has undertaken to make unless:

      i.      Tenant has given notice to Landlord of the need to make such repairs, or a condition of the Premises requiring repair; and

      ii.      Landlord has failed to commence to make such repairs within a reasonable time after receipt of such notice.

Tenant agrees that, from and after the date that possession of the Premises is delivered to Tenant and until the end of the Term, Tenant will keep neat and clean and maintain in good order, condition and repair the Premises and every part thereof, other than those portions thereof and those repairs for which this <u>Section 7.1</u> provides expressly that Landlord is responsible (except to the extent Tenant is excused from responsibility therefor under the provisions of <u>Section 14.1</u>); including without limitation the interior of the Premises, and the fixtures and equipment therein and appurtenant thereto, including the exterior and interior windows, window frames, doors, door frames and entrances, store fronts, signs, showcases, floor coverings, nonstructural interior walls, columns and partitions; interior lighting, electrical equipment exclusively serving the Premises, plumbing and sewerage facilities and equipment exclusively serving the Premises; and the heating, ventilating and/or air-conditioning equipment serving the Premises. Without limitation, Tenant shall maintain and use the Premises in accordance with all directions, rules and regulations of the proper officers of governmental agencies having jurisdiction, and shall, at Tenant's own expense, obtain all permits, licenses and the like, and make all repairs and necessary replacements to the Premises required by applicable Legal Requirements. Tenant shall not permit or commit any waste. Tenant shall provide its own HVAC system to heat and cool the Premises pursuant to all applicable codes. Tenant shall enter into a service contract with a reputable HVAC contractor for inspections and maintenance four (4) times per year and shall provide Landlord with a copy of same. Tenant shall have the right to access and use the roof of the Building, in the areas shown on the Roof Plan, as necessary to install, maintain and repair any heating, ventilating and/or air-conditioning equipment exclusively serving the Premises which is approved by Landlord, provided that any access to the roof of the Building by or on behalf of Tenant, and any work performed by or on behalf of Tenant thereon, shall be performed in compliance with applicable Legal Requirements and the applicable requirements of this Lease, pursuant to a scope of work reasonably approved by Landlord prior to the performance of any such work, and in a manner that does not adversely affect the condition of the Building and the Building's systems and equipment, and which does not breach the terms or conditions of, or void, any warranty or service contracts relating thereto, including, without limitation, Landlord's roof warranty. Tenant shall perform any

-20-

such work in such a way as to minimize interference with the operation of the Building and the Project and the operations of tenants, licensees and other occupants of the Building and at such times and in accordance with rules and regulations as Landlord may reasonably require in order to minimize such interference. Notwithstanding anything to the contrary contained in this Lease, all work to be performed by or on behalf of Tenant on, to, or involving the roof of the Building shall be performed by Landlord's roofing contractor, at Tenant's expense, to maintain the roof warranty. All contractors performing work for Tenant at the Project or any portion thereof shall be reasonably acceptable to, and approved by, Landlord. Subject to Force Majeure events (defined in <u>Section 17.4</u>) and matters not within the Landlord's control, Landlord shall, in its use, ownership, operation and management of the Building and the Project, maintain the elements and facilities of the Building and the Project which are Landlord's obligation under <u>Section 7.1</u> above so as not to be in violation of applicable Legal Requirements.

If repairs or replacements are required to be made by Tenant pursuant to the terms hereof, Landlord may demand by written notice to Tenant that Tenant make the same within a reasonable time after notice, and if Tenant refuses or neglects to commence such repairs within ten (10) days after written notice from Landlord (but no notice is required in the event of an emergency) and thereafter diligently pursue completion of such repairs or replacements, subject to Force Majeure events, Landlord may (but shall not be required to do so) make or cause such repairs to be made and shall not be responsible to Tenant for any loss or damage that may accrue to Tenant's stock or business by reason thereof including reasonable costs for supervision of such repairs. If Landlord makes or causes such repairs to be made, Tenant agrees that Tenant will pay to Landlord, as Additional Rent the cost thereof including reasonable costs for supervision of such repairs within thirty (30) days following written invoice from Landlord.

7.2    <u>Services and Utilities</u>.

Tenant shall pay for all Tenant's requirements including water, sewer, gas, electricity, and communications, and all applicable utility company surcharges, adjustments and taxes, and shall pay all costs relating to the heating and air-conditioning of the Premises. Tenant shall pay for gas, electricity, and communications services directly to the providers of such services and shall pay for the cost of water and sewer service for the Premises based on the sub-meter readings to Landlord without markup by Landlord within thirty (30) days following the date of Landlord's invoice and copy of the sub-meter readings for the Premises and at the rates charged by the utility provider. Tenant shall enter into a service contract with a HVAC contractor reasonably acceptable to Landlord for inspections and maintenance four (4) times per year and shall provide Landlord with a copy of same. If a charge shall be made separate and apart from real estate taxes by the public authority having jurisdiction over the use of the sewer system, Tenant shall pay as Additional Rent Tenant's Proportional Share thereof or such other amount if the taxing authority directly attributes an amount to the Premises. Landlord shall not be liable to Tenant for any interruption in service of water, electricity, heating, air-conditioning or other utilities and services caused by an unavoidable delay, by the making of any necessary repairs or improvements, by unavailability of fuel, or by any cause beyond Landlord's reasonable control. Tenant agrees that it will not install any equipment which shall exceed or overload the capacity of any utility facilities and that if any equipment installed by Tenant shall require additional utility facilities, the same

-21-

shall be installed at Tenant's expense and only upon written consent of Landlord in accordance with plans and specifications to be approved in writing by Landlord.

Except in case of emergency repairs, Landlord will give Tenant at least forty-eight (48) hours advance notice of any scheduled service interruptions and will use reasonable efforts to avoid unnecessary inconvenience to Tenant by reason thereof, including, without limitation, using reasonable efforts to schedule such service interruptions outside of Tenant's normal operating hours.

## ARTICLE VIII.
## TENANT'S SHARE OF OPERATING COSTS

8.1    Operating Costs.

In addition to all other payments herein provided to be made by Tenant to Landlord, Tenant shall also pay to Landlord, as Additional Rent, Tenant's Proportional Share of Operating Costs, as hereinafter defined. Landlord shall make an annual estimate of Tenant's Proportional Share of Operating Costs for each calendar year falling entirely or partly within the Term. Tenant's Proportional Share of Operating Costs, based upon such estimates, shall be due and payable, on account, on a monthly basis at the times and in the fashion herein provided for the payment of Minimum Rent. Within one hundred and twenty (120) days following the end of each calendar year falling entirely or partly within the Term, Landlord shall send Tenant a reasonably detailed and itemized accounting statement of the actually incurred costs for the prior calendar year, and the parties shall make a reconciliation adjustment within thirty (30) days following Tenant's receipt of such accounting statement. If during any calendar year the actual amount of Operating Costs appear to Landlord to be running materially below or above the estimate, Landlord may give Tenant notice of the variation and monthly payment on account shall be appropriately adjusted. Landlord shall have the same rights and remedies for the failure of Tenant to pay the sums due hereunder as with respect to the Minimum Rent. Any operating expense annual reconciliation (and any Project Real Estate Tax Statement) sent to Tenant shall be conclusively binding on Tenant.

For the purposes hereof, "**Operating Costs**" shall be mean all of the costs and expenses of every kind and nature paid or incurred by Landlord (including appropriate reserves) in operating, managing, maintaining, equipping, lighting, repairing, and replacing elements of the Project and areas exclusively serving or benefiting the Project (including appropriate reserves), including, without limitation, the surface parking areas (but excluding any parking garages serving the residential tenants of the Project), legal and accounting fees directly related to the Project, administrative fee equal to ten percent (10%) of Operating Costs, building supplies, snow removal, lighting, repairs and maintenance, landscaping, planting and replanting, holiday and seasonal decorating and decorations, painting, pointing and costs and expenses of all roof repairs, security if any (Landlord makes no representation that the same will be provided or to what extent), personnel salaries, wages, employment taxes, reasonable, customary and mandatory benefits for employees of Landlord, costs of any contractor of Landlord engaged in the cleaning, operating, maintenance or management of the Project, Landlord's insurance of every description and type for the Project, service contracts with independent contractors for any of the foregoing, the cost of

-22-

capital replacements and/or improvements (which cost shall amortized over a reasonable period as Landlord shall determine, together with interest on the unamortized balance) ("**Permitted Capital Expenditures**"), and all other expenses now or hereafter incurred in connection with the operation, maintenance and management of similar class projects.

Operating Costs shall be determined for the Project as a whole, and Landlord in its reasonable discretion, shall equitably allocate such Operating Costs to the Retail Stores and Tenant shall be responsible for paying Tenant's Proportional Share of the Operating Costs as so allocated to the Retail Stores.  Notwithstanding the foregoing, the following shall be excluded from Operating Costs and Project Operating Costs (the "**Excluded Costs**"):

i.    Salaries and other benefits of officers and executives and other employees of Landlord above the level of property manager or not directly connected with the operation of the Project;

ii.    depreciation of the Building or the Project and any equipment, except as expressly provided above;

iii.    any mortgage or financing charges (including interest, principal, points, fees and transfer taxes) or amortization on any mortgage or other debt instrument encumbering the Building or the Project;

iv.    costs of utilities supplied to any leasable space in the Project, exclusive only of the electricity supplied to (y) the fire alarm system serving all tenants of the Building and (z) the exterior common areas of the Project available for use by both retail and residential tenants;

v.    Project Real Estate Taxes collected under Article IX below and any taxes or expenses excluded from Project Real Estate Taxes under Article IX below;

vi.    costs incurred to supply elevator service to any portion of the Project;

vii.    costs to clean, repair or replace any exterior glass in the Project;

viii.    leasing fees or commissions, and other fee and expenses incurred in negotiations of new leases;

ix.    costs of a capital nature except for Permitted Capital Expenditures;

x.    costs relating to maintaining Landlord's existence as a corporation, partnership or other entity;

xi.    advertising, marketing and other fees and costs incurred in procuring tenants;

xii.    costs arising from the initial construction of the Project; and

-23-

xiii.    all costs to repair and maintain the residential units and any costs which benefit the residential portions of the Building exclusively and do not benefit the Retail Stores portion of the Property.

## ARTICLE IX.
## REAL ESTATE AND OTHER TAXES

9.1    Project Real Estate Taxes.

"**Project Real Estate Taxes**" shall mean all real estate taxes, betterments, and other general or special assessments imposed upon the Project, and upon any personal property of Landlord used in connection with the Project, or on Landlord's interest in the Project or such personal property (provided that to the extent such taxes, levies, and assessments are also allocable to other buildings in the Project, such amounts shall be equitably allocated among all real estate which is so jointly assessed), charges, fees and assessments for transit, housing, police, fire or other services or purported benefits to the land of the Project, service or user payments in lieu of taxes, and any and all other taxes, levies, betterments, assessments and charges arising from the ownership, leasing, operating, use or occupancy of the Project or based upon rentals derived therefrom, which are or shall be imposed by federal. state, county, municipal or other governmental authorities, plus the reasonable costs incurred in any attempt to obtain a real estate tax abatement for the real estate taxes due during the Term hereof, whether or not successful. Provided, however, that if at any time during the Term or any extension thereof, the present system of ad valorem taxation of real property shall be changed so that in lieu of, or in addition to the whole or any part of the present type of ad valorem tax on real property, there shall be assessed on the Landlord or the Building or the Project a capital levy or other tax on the rents or lease payments received with respect to the Building or Project, or a federal, state, county, municipal, or other local income, franchise, excise or similar tax, assessment, levy or charge (distinct from any now in effect) measured by or based, in whole or in part, upon any such rents, lease payments, or mortgages, then any and all of such taxes, assessments, levies or charges, to the extent so measured or based, shall be deemed to be included within the term "Project Real Estate Taxes" but calculated as if the Project were the only property of Landlord. Tenant shall pay the amount of said tax upon receipt of written notice thereof from Landlord, and in the event that a tax is imposed which shall be due on a continuing basis, the same shall be due and payable with each monthly Minimum Rent payment.

9.2    Initial Responsibility.

The initial responsibility for the payment of the Project Real Estate Taxes shall be upon the Landlord, and Landlord agrees to pay the same as required by law.  In the event of any abatements, refunds or rebates of such real estate taxes, an appropriate adjustment shall be made between Landlord and Tenant to take into account such abatements, refunds or rebates less all costs and expenses of securing the same, provided no default of Tenant then exists.

9.3    Tenant's Share of Real Estate Taxes.

Tenant agrees to pay to Landlord, as Additional Rent, Tenant's Proportional Share of the amount of Project Real Estate Taxes allocable to the Retail Stores portion of the Project

-24-

(collectively, "**Tenant's Share of Real Estate Taxes**") within thirty (30) days of Landlord's invoice therefore. Landlord shall reasonably allocate the Project Real Estate Taxes among the Retail Stores portion of the Project and the residential portion of the Project using sound management practices and based upon the assessed valuations and tax rates set forth for such portions of the Project on the real estate tax assessors field cards for the Project.

Landlord shall from time to time reasonably estimate the amount due from Tenant under this Section 9.3 with respect to any calendar year falling entirely or partly within the Term, and Tenant shall pay periodically as Landlord may determine, but not more frequently than monthly the amount of Landlord's estimate as rent with the next due payment of monthly Minimum Rent.

Subsequent to Landlord's receipt of the actual tax bill from the taxing authority, Landlord shall render Tenant a statement (together with a copy of the tax bill) showing for the applicable period Landlord's tax expense and any other amount due from Tenant or any credit due to Tenant hereunder. Payment by Tenant of any amount due shall be made as Additional Rent with Tenant's next due payment of monthly Minimum Rent and Landlord shall credit the amount of any overpayment against subsequent obligations of Tenant under this Section 9.3 (or refund such overpayment, if the term of this Lease has ended and Tenant has no further obligations to Landlord).

9.4    Tenant's Personal Property, Equipment and Other Taxes.

Tenant shall pay such taxes which may be lawfully charged, assessed, or imposed upon all fixtures, equipment, leasehold improvements, alterations and additions of every type and also upon all merchandise and personal property in the Premises, and Tenant shall pay all license fees which may lawfully be imposed upon the business of Tenant conducted upon the Premises.

Provided, however, that if at any time during the Term or any extension thereof, the present system of ad valorem taxation of real property shall be changed so that in lieu of, or in addition to the whole or any part of the present type of ad valorem tax on real property, there shall be assessed on the Landlord or the Building or the Project a capital levy or other tax on the rents or lease payments received, or a tax on mortgages with respect to the Building or Project, or a federal, state, county, municipal, or other local income, franchise, excise or similar tax, assessment, levy or charge (distinct from any now in effect) measured by or based, in whole or in part, upon any such rents, lease payments, or mortgages, then any and all of such taxes, assessments, levies or charges, to the extent so measured or based, shall be deemed to be included within the term "Project Real Estate Taxes." Tenant shall pay the amount of said tax upon receipt of written notice thereof from Landlord, and in the event that a tax is imposed which shall be due on a continuing basis, the same shall be due and payable with each monthly Minimum Rent payment.

## ARTICLE X.
## INDEMNITY AND PUBLIC LIABILITY INSURANCE

10.1    Indemnity.

Tenant agrees, to the maximum extent this agreement may be made effective according to law, to pay, and to protect, indemnify and save harmless, Landlord and its beneficiaries, trustees,

-25-

representitives, general or limited partners, affiliates, designees, officers, members, lenders, agents, employees, successors or assigns (the **"Landlord Related Parties"**) from and against any and all claims of whatever nature from (a) any accident, injury or damage whatsoever in or about the Premises caused to any person, or to the property of any person, occurring after the Lease Commencement Date or the entry by Tenant, if earlier, and until the end of the Term of this Lease and thereafter so long as Tenant is in occupancy of any part of the Premises, (b) arising from any accident, injury or damage occurring outside of the Premises but within the Project, where such accident, damage or injury results or is claimed to have resulted from (i) any act or omission on the part of Tenant or Tenant's contractors, licensees, invitees, agents, servants, employees, or customers, or (ii) Tenant's breach of its obligations under this Lease. This indemnity and hold harmless agreement shall include indemnity against all costs, expenses and liabilities incurred in connection with any such claim or proceedings brought thereon, and the defense thereof with counsel acceptable to Landlord. The provisions of this <u>Section 10.1</u> shall survive the expiration or termination of this Lease.

10.2    <u>Tenant's Risk</u>.

To the maximum extent this agreement may be made effective according to law and except as otherwise provided in this Lease, Tenant agrees to use and occupy the Premises and to use such other portions of the Building and Project as Tenant is herein given the right to use at Tenant's own risk; and Landlord and Landlord's agents and employees shall have no responsibility or liability for, and Tenant waives all claims for, any loss of or damage to fixtures or other personal property sustained by Tenant or any party claiming by, through or under Tenant by way of subrogation or otherwise resulting from any accident or occurrence in or upon the Premises, the Building or the Project. In no event shall Landlord be liable for the loss of stored data. The provisions of this <u>Section 10.2</u> shall be applicable from and after the Lease Commencement Date and until the end of the Term of this Lease, and during such further period as Tenant may use or be in occupancy of any part of the Premises, the Building or the Project.

10.3    <u>Injury Caused by Third Party</u>.

To the maximum extent this agreement may be made effective according to law, Tenant agrees that Landlord shall not be responsible or liable to Tenant or to those claiming by, through or under Tenant, for any loss or damage that may be occasioned by or through the acts or omissions of persons occupying adjoining premises or any part of the premises adjacent to or connecting with the Premises or any part of the Building or Project, or otherwise, or for any loss or damage resulting to Tenant, for its or their property, from the breaking, bursting, stopping or leaking of electric cables and wires or water, gas or sewer pipes.

10.4    <u>Commercial Liability Insurance</u>.

Tenant agrees to maintain, at its expense, in full force and effect from the date upon which Tenant first enters the Premises or the Project for any reason, throughout the Term of this Lease, and thereafter so long as Tenant may use or be in occupancy of any part of the Premises, with responsible companies licensed to do business in the State of Georgia, (1) a policy of commercial general liability and property damage insurance under which Landlord, Northland Investment Corporation (and any other parties requested by Landlord such as property managers or

-26-

mortgagees that have an interest in the Property) are named as additional insureds in the broadest form of such coverage from time to time reasonably available in the jurisdiction in which the Premises are located, and (2) special form/cause of loss insurance (formerly known as "all risk" property insurance) on a "replacement cost" basis, insuring (i) Tenant's Property (as hereinafter defined), and (ii) Tenant's Work, Alterations, and any other leasehold improvements and fixtures located in the Premises, whether made by or on behalf of Tenant or any party claiming by, through or under Tenant pursuant to this Lease or otherwise existing in the Premises as of the Commencement Date (collectively, the "**Improvements**"), in an amount at least equal to the full replacement cost of Tenant's Property and all such Improvements. Tenant shall also maintain automobile liability insurance (including coverage for Non-Owned and Hired Auto) (covering any automobiles owned or operated by Tenant at the Project) issued on a form at least as broad as ISO Business Auto Coverage form CA 00 01 07 97 or other form providing equivalent coverage. Tenant or its designee shall provide Landlord with notice of any cancellation, non-renewal, material change or reduction in coverage to Tenant's insurance coverages within three (3) business days following receipt of notice of such action from its insurance carrier. A certificate of insurance (evidencing the coverages and adding the required additional insured parties as additional insureds) therefor shall be delivered to Landlord on or before the date upon which Tenant first enters the Premises or the Project for any reason, and Tenant shall, within five (5) business days prior to the expiration of any such insurance, deliver certificates of insurance evidencing the renewal or replacement of such insurance. The minimum limits of such policies of liability insurance shall be at least equal to $1,000,000 per occurrence, $2,000,000 annual aggregate. Such insurance may be covered by Tenant under blanket coverage. From time to time during the Term hereof, the aforesaid limits of coverage shall be for such higher limits, if any, as are customarily carried in the area in which the Premises are located with respect to similar properties. If Tenant fails to comply with the foregoing requirements and such failure is not cured within five (5) business days of written notice from Landlord, Landlord may obtain such insurance and keep same in effect, and all sums paid for insurance by Landlord hereunder (together with Landlord's reasonable administrative expense in procuring such insurance) shall be and are hereby declared Additional Rent, due and payable forthwith.

## ARTICLE XI.
## LANDLORD'S ACCESS TO PREMISES

11.1    Landlord's Right of Access.

Subject to the provisions of <u>Section 2.2</u> and the provisions of this <u>Section 11.1</u>, Landlord shall have the right, during the hours that Tenant is open to the public and upon reasonable prior notice of not less than 24 hours (except in the case of an emergency in which event no such notice shall be required) to enter the Premises to inspect or to exhibit the same to prospective purchasers, mortgagees and prospective tenants and to make such repairs, additions, alterations or improvements necessary to maintain the Building in good working condition and in compliance with Landlord's obligations under this Lease, or necessary to comply with applicable Legal Requirements. Landlord shall use reasonable efforts not to unreasonably interfere with Tenant's business. Except in the case of emergency, Landlord and Tenant shall reasonably cooperate to schedule Landlord's repairs, alterations, additions or improvements in order to minimize interference with Tenant's use and occupancy of the Premises. Landlord shall be allowed to

-27-

temporarily take (but not leave) all materials in, to and upon the Premises that may be customarily required in connection with the exercise of the foregoing rights without the same constituting an eviction of Tenant in whole or in part and the rents reserved shall in no way abate while said work is in progress by reason of loss or interruption of Tenant's business or otherwise and Tenant shall have no claim for damages as a result of such access or work by Landlord in the Premises.

If Tenant shall not be personally present to permit an entry into the Premises when for any reason an entry therein shall be permissible, Landlord may enter, only in the case of emergency, by the use of force without, in any event, incurring liability therefor and without in any manner affecting the obligations of this Lease. The provisions of this Section 11.1 shall in no way be construed to impose upon Landlord any obligation whatsoever for the maintenance or repair of the Building or any part thereof except as otherwise herein specifically provided. Landlord shall have a right of access if necessary to effect its rights under Section 7.1. For the purpose of this Article XI, the term "Landlord" shall mean Landlord, its managing agent, employees or servants or any person authorized by Landlord to enter the Premises pursuant to the provision of this Article XI.

## ARTICLE XII.
## DAMAGE CLAUSE

### 12.1    Partial Damage.

If, after the commencement of the Term of this Lease, and prior to the expiration or earlier termination hereof, the Premises shall be partially damaged (as distinguished from "substantially damaged", as that term is hereinafter defined) by fire or casualty, Landlord shall promptly proceed to restore the Premises to the extent originally constructed by Landlord, but Landlord shall not be responsible for delay which may result from any cause beyond the reasonable control of Landlord. Landlord's obligations shall be limited to the net amount of insurance proceeds actually made available (plus the amount of insurance deductible maintained thereon) to Landlord for such rebuilding by Landlord's mortgagee. Upon Landlord's substantial completion of its work, Tenant will promptly complete any repairs required of it necessary to occupy and open the damaged areas.

### 12.2    Substantial Damage.

If, after the commencement of the Term of this Lease, and prior to the expiration or earlier termination hereof, the Premises shall be substantially damaged (as that term is hereinafter defined) by fire or casualty, the risk of which is covered by Landlord's insurance, Landlord shall, provided this Lease is not terminated as hereinafter provided, promptly after such damage and the determination of the net amount of insurance proceeds available to Landlord, expend as much as may be necessary of such net amount to restore (consistent, however, with zoning laws and building codes then in existence) the Premises to substantially the condition originally constructed by Landlord, but Landlord shall not be responsible for delay which may result from any cause beyond the reasonable control of Landlord. Should the net amount of insurance proceeds (plus any deductible amount maintained in such insurance) available to Landlord by its mortgagee be insufficient to cover the cost of restoring Premises, in the sole reasonable estimate of Landlord, Landlord may, but shall have no obligation to, supply the amount of such insufficiency and restore the Premises to the extent originally constructed by Landlord with all reasonable diligence, or Landlord may terminate this Lease by giving notice to Tenant not later than sixty (60) days after

-28-

Landlord has determined the estimated net amount of insurance proceeds available to Landlord and the estimated cost of such restoration; however, Landlord may, in lieu of terminating this Lease, give Tenant the option, to be exercised by Tenant within thirty (30) days after receiving Landlord's notice of this option, to pay to Landlord, at the time Tenant notifies Landlord of Tenant's decision to exercise such option, the difference between the amount of insurance proceeds and the cost of repair and restoration, in which case Landlord shall repair and restore the Premises as aforesaid and shall provide Tenant with satisfactory evidence that all sums contributed by Tenant have been expended by Landlord in paying the cost of such repair and restoration. After Landlord's substantial completion of restoration of the Premises, if this Lease has not been terminated, Tenant will complete its repairs, if any, necessary to occupy and open the damaged areas. Landlord may only terminate this Lease under this Section 12.2 if Landlord terminates the leases of all other retail tenants in the Project impacted by the casualty.

12.3    Definitions of "Substantial Damage" and "Substantially Damaged".

The terms **"substantial damage"** and **"substantially damaged,"** as used herein, shall refer to damage of such character that the same cannot, in the ordinary course, reasonably be expected to be repaired within two hundred seventy (270) days from the time that such work would commence.

12.4    Damage to Other Portions of the Building, the Project and Uninsured Casualty.

If, however, the Premises or other buildings at the Project shall be substantially damaged or destroyed by fire or casualty, Landlord shall, if this Lease is not terminated, promptly restore (consistent, however, with zoning laws and building codes then in existence) the Premises, the common areas necessary for access to the Premises and the surface parking areas of the Project, unless Landlord, within ninety (90) days after such loss, gives notice to Tenant of Landlord's election to terminate this Lease. If Landlord shall give such notice, then this Lease shall terminate as of the date of such notice with the same force and effect as if such date were the date originally established as the expiration date hereof. Further, if there shall be damage or destruction from any cause to the Building or to other buildings in the Project to such extent that continued operation of the Building or the Project would, in Landlord's reasonable judgment, be uneconomic, Landlord shall also have the right, at any time after such damage, to terminate this Lease by notice to Tenant in which is stated a date as of which Landlord desires surrender of the Premises, and this Lease shall terminate as of the date so stipulated as if the same were the date originally established as the expiration date hereof.

12.5    Damage During Last Year of Term.

If the Premises shall be substantially damaged by fire or casualty within the last year of the Term of this Lease, either party shall have the right, by giving notice to the other not later than sixty (60) days after such damage, to terminate this Lease, whereupon this Lease shall terminate as of the date of such notice with the same force and effect as if such date were the date originally established as the expiration date hereof. Notwithstanding the foregoing, if, within thirty (30) days of Landlord's exercise of the termination right set forth in this Section 12.5, Tenant exercises the next option to extend the Term (if any options remain to be exercised), Landlord's exercise of the termination right solely under this Section 12.5 shall be null and void, and this Lease shall be

-29-

deemed extended for and through the date of expiration set forth as to the next applicable option period; provided, however, the foregoing nullification shall not apply if termination is based on other than the provisions of this Section 12.5.

      12.6     Abatement of Rent.

If the Premises shall be damaged by fire or casualty, the Minimum Rent and the Additional Rent and other charges payable by Tenant under Section 7.2, Article VIII and Section 9.3 hereof shall abate or be reduced proportionately for the period in which, by reason of such damage, there is substantial interference with the operation of Tenant's business in the Premises, having regard to the extent to which Tenant may be required to discontinue Tenant's business in the Premises, but such abatement or reduction shall end on the date which is the earlier to occur of (i) the date Tenant substantially completes Tenant's restoration of the Premises, and (ii) the date one hundred twenty (120) days following substantial completion by Landlord of the work which Landlord is required to do under this Article II in restoration of the Premises.

**ARTICLE XIII.**
**EMINENT DOMAIN**

      13.1     Rights of Termination for Taking.

If the whole of the Premises, or such portion thereof as to render the balance (if reconstructed to the maximum extent practicable in the circumstances) unsuitable for Tenant's purposes, shall be taken by condemnation or right of eminent domain, Landlord or Tenant shall have the right to terminate this Lease by notice to the other of its desire to do so, provided that such notice is given not later than thirty (30) days after Tenant has been deprived of possession. This Lease shall terminate as of the date possession shall be taken by such taking authority, and Tenant shall pay Rent and perform all of its obligations under this Lease up to such date with a proportionate refund by Landlord of any Rent which shall have been paid in advance for periods subsequent to such date.

Further, if so much of the Building or Project shall be so taken that continued operation of the Building or Project would be uneconomic as determined by Landlord in its sole discretion or if Landlord's mortgagee will not permit the application of taking proceeds towards reconstruction and Landlord is terminating all of the leases (including this Lease) in the Building, Landlord shall have the right to terminate this Lease by giving notice to Tenant of Landlord's desire to do so not later than sixty (60) days after the effective date of such taking. If this Lease is so terminated, it shall terminate as of the date possession is taken by such taking authority and Tenant shall pay Rent and perform all of its obligations under this Lease up to such date with a proportionate refund by Landlord of any Rent which shall have been paid in advance for periods subsequent to such date. Should any of the Premises be so taken or condemned and such taking or condemnation occurs after the commencement of the Term of this Lease, and should this Lease not be terminated in accordance with the foregoing provisions, Landlord agrees promptly after such taking or condemnation, and the determination of Landlord's award on account thereof, to expend so much as may be necessary of the net amount which may be awarded to Landlord in such condemnation proceedings in restoring (consistent, however, with zoning laws and building codes then in existence) the Premises to substantially the condition originally constructed by Landlord as shall

-30-

be practicable. Should the net amount so awarded to Landlord be insufficient to cover the cost of restoring the Premises, in the reasonable estimate of Landlord, Landlord may, but shall have no obligation to, supply the amount of such insufficiency and restore the Premises as aforesaid, or, if Landlord elects not to restore by notice to Tenant not later than one hundred twenty (120) days after the taking, either Landlord or Tenant may terminate this Lease by giving notice to the other not later than a reasonable time after Landlord has determined the estimated net amount which may be awarded to Landlord and the estimated cost of such restoration.

13.2    Payment of Award.

Landlord shall have and hereby reserves and excepts, and Tenant hereby grants and assigns to Landlord, all rights to recover for damages to the Project site, the Building site, the Premises, the Building and the other buildings in the Project, including without limitation any and all damages as compensation for diminution in value of the leasehold, reversion and fee of the Premises and any other compensation accrued or hereafter to accrue by reason of such taking, damage or destruction, and by way of confirming the foregoing, Tenant hereby grants and assigns, and covenants with Landlord to grant and assign, to Landlord all rights to such damages or compensation. Nothing contained herein shall be construed to prevent Tenant from prosecuting in any condemnation proceedings a claim for the value of any of Tenant's usual trade fixtures installed in the Premises by Tenant at Tenant's expense, Tenant's unamortized costs to perform the Tenant Work and other Alterations performed and paid for by Tenant under this Lease and for relocation expenses, provided that such action shall not affect the amount of compensation otherwise recoverable by Landlord from the taking authority.

13.3    Abatement of Rent.

In the event of any such taking of the Premises where this Lease is not terminated, the Minimum Rent, Additional Rent and other charges, or a fair and just proportion thereof, according to the extent of the taking, shall be abated or reduced proportionately for the period in which, by reason of such taking, there is substantial interference with the operation of Tenant's business in the Premises, having regard to the extent to which Tenant may be required to discontinue Tenant's business in the Premises, but such abatement or reduction shall end upon the date which is sixty (60) days following the date of completion by Landlord of Landlord's restoration, if any, hereunder.

**ARTICLE XIV.**
**WAIVER OF SUBROGATION**

14.1    Non-Subrogation.

Landlord and Tenant shall obtain an appropriate clause in, or endorsement on, each of its all-risk insurance policies pursuant to which the insurer waives all right of subrogation or consents to a waiver of right of recovery against the other regardless of the cause of any such claim or loss. Landlord and Tenant each hereby waives any and all rights of recovery, claims, actions or causes of action against the other party, for any loss or damage to property or resulting from damage to such property (including, without limitation, the Premises and the Building), arising from any risk which is covered by the property insurance coverages maintained by such waiving party under the

-31-

terms of this Lease (or which would have been covered had the waiving party carried the coverages required by it under this Lease) regardless of the cause of any such claim or loss, including without limitation the fault or negligence of either party or their respective agents, employees or contractors, to the extent of the proceeds payable under said insurance or the proceeds that would have been payable had the insurance been maintained.

## ARTICLE XV.
## HAZARDOUS MATERIALS

15.1    Hazardous Materials.

Except for normal quantities of cleaning and office supplies and ordinary consumer products used or stored in the Premises in connection with the normal conduct of Tenant's operations in the Premises and which are stored in compliance with Legal Requirements and in proper containers, Tenant shall not (either with or without negligence) cause or permit the escape, disposal or release of any Hazardous Materials. Tenant shall not allow the storage or use of such Hazardous Materials in any manner not sanctioned by law or by the highest standards prevailing in the industry for the storage and use of such substances or materials, nor allow to be brought into the Premises or Building or land on which the Building is located any such materials or substances except to use in the ordinary course of Tenant's business. If any lender or governmental agency shall ever require testing to ascertain whether or not there has been any release of Hazardous Materials by Tenant and it is determined that there was a release of Hazardous Materials by Tenant, then the reasonable costs thereof shall be reimbursed by Tenant to Landlord upon demand as Additional Rent. In addition, Tenant shall execute affidavits, representations and the like from time to time at Landlord's request concerning Tenant's best knowledge and belief regarding the presence of hazardous substances or materials on the Premises. In all events, Tenant shall indemnify Landlord and Landlord Related Parties in the manner elsewhere provided in this Lease from any release of Hazardous Materials on the Premises on account of the use, release or discharge from the Premises by Tenant or any party claiming by, through or under Tenant or by any of Tenant's employees, agents, contractors, invitees, subtenants or licensees, or elsewhere if caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the term of this Lease. "**Hazardous Materials**," as used herein, shall mean any flammables, explosives, radioactive materials, hazardous wastes, hazardous and toxic substances or related materials, asbestos or any material containing asbestos, or any other substance or material as defined by any federal, state or local environmental law, ordinance, rule or regulation ("**Environmental Laws**"), including, without limitation, the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, the Hazardous Materials Transportation Act, as amended, the Resource Conservation and Recovery Act, as amended, the Georgia Hazardous Site Response Act, as amended, and any other applicable State environmental laws, as amended, and in the regulations adopted and publications promulgated pursuant to each of the foregoing.

## ARTICLE XVI.
## DEFAULT

16.1    Events of Default.

-32-

Any of the following occurrences or acts shall constitute an **"Event of Default"** under this Lease:

(a)    Tenant shall fail to pay any payment of Rent on or before the date on which the same becomes due and payable, and such failure continues for five (5) business days after notice thereof from Landlord to Tenant, or

(b)    Landlord having rightfully given the notice specified in Section 16.1(a) above to Tenant in any twelve (12) month period and Tenant shall thereafter in the same twelve (12) month period fail to pay any payment of Rent on or before the date on which the same becomes due and payable, or

(c)    Tenant shall fail to perform or observe some term or condition of this Lease which, because of its character, would constitute a present danger to persons or property in the Building or would immediately jeopardize Landlord's interest in the Premises or Building and Tenant shall not cure such failure within two (2) business day following receipt of written notice from Landlord and provided that, if the cure of such default is not reasonably achievable immediately but is subject to cure, then Tenant shall be given such additional time to cure said default as is necessary provided that Tenant undertakes said cure immediately and diligently pursues cure, or

(d)    Tenant shall at any time carry on a use of the Premises other than the Permitted Use specified in Section 1.2, or fail to comply with the provisions of Section 5.2, (for which there shall be no cure period); or

(e)    Tenant shall fail to perform or observe any other term or condition contained in this Lease other than as specified above (and where no cure is provided), and such failure continues for more than thirty (30) days after notice thereof from Landlord; provided, further, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant shall commence such cure within said thirty (30) day period and thereafter diligently prosecute such cure to completion, or

(f)    If the estate hereby created shall be taken on execution by other process of law, or if Tenant or any Guarantor shall be judicially declared bankrupt or insolvent according to law, or if any assignment shall be made of the property of Tenant or any Guarantor for the benefit of creditors, or if a petition shall be filed for the reorganization of Tenant or any Guarantor under the provisions of the Bankruptcy Code now or hereafter enacted and providing a plan for a debtor to settle, satisfy or extend the time for the payment of debts (there being no cure hereunder), or if a receiver, guardian, conservator trustee in involuntary bankruptcy or other similar officer shall be appointed to take charge of all or any substantial part of Tenant's or any Guarantor's property by a court of competent jurisdiction (the **"Involuntary Proceeding"**), which Involuntary proceeding shall not be dismissed within ninety (90) days after filing therefor.

16.2    Right to Terminate.

If an Event of Default shall have occurred (notwithstanding any license of any former breach of covenant or waiver of the benefit hereof or consent in a former instance), Landlord lawfully may,

-33-

immediately or at any time thereafter, give Tenant written notice of Landlord's election to terminate this Lease on a date specified in such notice. Upon the giving of such notice, this Lease shall terminate and the estate hereby granted shall expire and terminate on such date as fully and completely and with the same effort as if the date were the date originally fixed for expiration of the Term and the rights of Tenant hereunder shall terminate; however, Tenant shall remain liable as set forth below. Upon such termination, Tenant shall immediately surrender the Premises to Landlord in the condition set forth in Section 17.6 herein.

    16.3    Right of Re-Entry.

If an Event of Default shall have occurred, Landlord shall have the immediate right, whether or not this Lease shall have been terminated pursuant to Section 16.2, without demand or notice to enter into and upon the Premises or any part thereof in the name of the whole and repossess the same as Landlord's former estate, and expel Tenant and those claiming through or under Tenant and remove its or their effects by summary proceedings, ejectment or other lawful process without being guilty of trespass and without prejudice to any remedies which might otherwise be used for arrears of rent or preceding breach of covenant. No such re-entry or taking shall be construed as an election on Landlord's part to terminate this Lease unless a written notice of such election is given to Tenant pursuant to Section 16.2 or unless so decreed by a court of competent jurisdiction. Tenant covenants and agrees, notwithstanding any entry or re-entry by Landlord, whether by summary proceedings, termination, or otherwise, to pay and be liable for, on the days originally fixed herein for the payment thereof, amounts equal to the several installments of rent and other charges reserved as they would, under the terms of this Lease, become due if this Lease had not been terminated or if Landlord had not entered or re-entered, as aforesaid.

    16.4    Right to Relet.

At any time or from time to time after the repossession of the Premises or any part thereof pursuant to Section 16.3, whether or not this Lease shall have been terminated pursuant to Section 16.2, Landlord may (but shall be under no obligation to relet the Premises or any part thereof for the account of Tenant, in the name of Tenant or Landlord or otherwise, without notice to Tenant, for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the Term) and on such conditions (which may include concessions or free rent) and for such uses as Landlord, in its absolute discretion, may determine, and Landlord may collect and receive any rents payable by reason of such reletting. Landlord shall not be responsible or liable for any failure to collect any rent due upon such reletting.

    16.5    Tenant to Remain Liable.

No expiration or termination of this Lease pursuant to Section 16.2, by operation of law or otherwise, and no repossession of the Premises or any part thereof pursuant to Section 16.3 or otherwise, and no reletting of the Premises or any part thereof pursuant to Section 16.4 or otherwise, shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination, repossession or reletting.

    16.6    Damages.

-34-

In the event of any expiration or termination of this Lease or repossession of the Premises or any part thereof by reason of the occurrence of an Event of Default, Tenant will pay to Landlord Rent required to be paid by Tenant under the terms of this Lease as and when due under this Lease until the end of what would have been the Term of this Lease in the absence of such expiration, termination or repossession and whether the Premises be relet or remain vacant in whole or in part, or for a period less than the remainder of the Term, but in the event the Premises be relet by Landlord, Tenant shall be entitled to a credit in the net amount of rent received by Landlord in reletting, after deducting all expenses incurred in reletting the Premises (including without limitation, legal fees, remodeling costs, brokerage fees and the like) and in collecting the rent in connection therewith.

Amounts received by Landlord after reletting shall first be applied against such Landlord's expenses, until the same are recovered, and until such recovery, Tenant shall pay, as of each day when a payment would fall due under this Lease, the amount which Tenant is obligated to pay under the terms of this Lease (Tenant's liability prior to any such reletting and such recovery not in any way to be diminished as a result of the fact that such reletting might be for a rent higher than the rent provided for in this Lease); when and if such expenses have been completely recovered, the amounts received from reletting by Landlord as have not previously been applied shall be credited against Tenant's obligations as of each day when a payment would fall due under this Lease, and only the net amount thereof shall be payable by Tenant. Further, amounts received by Landlord from such reletting for any period shall be credited only against obligations of Tenant allocable to such period, and shall not be credited against obligations of Tenant hereunder accruing subsequent or prior to such period; nor shall any credit of any kind be due for any period after the date when the Term of this Lease is scheduled to expire according to its terms.

As an alternative, at the election of Landlord, Tenant will, upon such termination, pay to Landlord, as liquidated damages, such a sum as at the time of such termination represents the amount of the then net present value of the total Rent and other benefits which would have accrued to Landlord under this Lease for the then remainder of the Term if the Term had not been terminated less the then fair and reasonable value of the Premises for the same period and with such net present value being determined by applying a discount rate of four percent (4%) per annum to such amounts. If Landlord secures a successor tenant, the rent and other sums being paid by such successor tenant shall be a satisfactory determination of the "fair and reasonable value" of the Premises.

For the purposes of this Article, the Percentage Rent (if any is called for under this Lease) for any period after any such default and entry by Landlord shall be treated as at a monthly rate equal to the average monthly Percentage Rent which Tenant was obligated to pay to Landlord under this Lease either: (i) from the commencement of the Term hereof to the date of such default; or (ii) during the last three (3) Lease Years prior to the date of such default, whichever is the greater, plus 10% per year for each such year of the unexpired portion of the Term.]

16.7    Rights Cumulative, Non-Waiver.

No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative

-35-

and in addition to any other right or remedy given hereunder or now or hereafter existing at law or in equity or by statute. The failure of Landlord to insist at any time upon the strict performance of any covenant or agreement or to exercise any option, right, power or remedy contained in this Lease shall not be construed as a wavier or relinquishment thereof for the future. The receipt by Landlord of any Rent with knowledge of the breach of any covenant or agreement contained in this Lease shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. In addition to the other remedies provided in this Lease, Landlord shall be entitled, to the extent permitted by applicable law, to injunctive relief in case of the violation, or attempted or threatened violation, of any of the covenants, agreements, conditions or provisions of this Lease, or to a decree compelling performance of this Lease, or to any other remedy allowed to Landlord at law or in equity.

16.8    Expenses.

Without limiting any of Landlord's rights and remedies hereunder, and in addition to all other amounts Tenant is otherwise obligated to pay, it is expressly agreed that Landlord shall be entitled to recover from Tenant all costs and expenses, including reasonable attorney's fees, incurred by Landlord in enforcing this Lease and Tenant's obligations and covenants hereunder.

16.9    Landlord's Right to Cure.

Landlord may, but shall not be obligated to, cure any default by Tenant after complying with the notice provisions herein set forth, and whenever Landlord so elects, all costs and expenses paid or incurred by Landlord in curing such default, including without limitation reasonable attorney's fees, shall be payable on demand with interest as provided in Section 4.1 hereof.

16.10    Landlord's Default.

Landlord shall in no event be in default in the performance of any of Landlord's obligations hereunder unless and until Landlord shall have failed to perform such obligations within thirty (30) days after written notice by Tenant to Landlord properly specifying wherein Landlord has failed to perform any such obligation, provided, however, that if such default is of such a nature that it cannot be completely remedied within said period of thirty (30) days, Landlord shall not be in default hereunder if it commences to remedy such default within said period of thirty (30) days and thereafter diligently and continuously prosecutes such remedy to completion. Tenant shall not assert any right to deduct the cost of repairs or any monetary claims against Landlord theretofore accrued from rent thereafter due and payable, but, in accordance with the provisions of Section 17.3, shall look solely to Landlord's interest in the Building for satisfaction of such claim.

## ARTICLE XVII.
## MISCELLANEOUS PROVISIONS

17.1    Waiver.

(a)    Failure on the part of Landlord or Tenant to complain of any action or non-action on the part of the other, no matter how long the same may continue, shall never be a

waiver by Landlord or Tenant of any of their respective rights hereunder; but the foregoing shall not apply to provisions of this Lease where a right of Tenant is dependent upon notice to be given within a specified period.  Further, no waiver at any time of any of the provisions hereof by Landlord or Tenant shall be construed as a waiver of any of the other provisions hereof, and wavier at any time of any of the provisions hereof shall not be construed as a waiver at any subsequent time of the same provisions.  The consent or approval of Landlord or Tenant to or of any action by the other requiring such consent or approval shall not be construed to waive or render unnecessary consent or approval to or of subsequent similar actions by the other.

(b)    No payment by Tenant, or acceptance by Landlord, of a lesser amount than shall be due from Tenant to Landlord shall be treated otherwise than as  a payment on account.  The acceptance by Landlord of a check for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such check, that such lesser amount is payment in full, shall be given no effect, and Landlord may accept such check without prejudice to any other rights or remedies which Landlord may have against Tenant, and Landlord may apply said check in its discretion against any charges then owed by Tenant.

(c)    Except as provided in <u>Section 17.17</u> hereof, notwithstanding anything contained in this Lease to the contrary, in no event and under no circumstances except as noted below: (i) shall Landlord be liable, or in any way responsible, to Tenant for indirect or consequential damages of any nature or for any reason whatsoever; or (ii) shall Tenant be liable, or in any way responsible, to Landlord for indirect or consequential damages of any nature or for any reason whatsoever.

17.2    <u>Covenant of Quiet Enjoyment</u>.

Provided no Event of Default has occurred and is continuing, Tenant shall lawfully, peacefully and quietly have, hold, occupy and enjoy the Premises during the Term hereof, without hindrance or ejection by any persons lawfully claiming under Landlord to have title to the Premises superior to Tenant.  The foregoing covenant of quiet enjoyment is in lieu of any other such covenant, express or implied; and it is understood and agreed that this covenant and any and all other covenants of Landlord contained in this Lease shall be binding upon Landlord and Landlord's successors only with respect to breaches occurring during Landlord's and Landlord's successors' respective ownership of Landlord's interest hereunder. Tenant acknowledges that the exercise by Landlord of any of the rights conferred on Landlord under this Lease and the entry upon the Premises for or in connection with such purposes shall not be deemed to be a constructive or actual eviction of Tenant and shall not be considered to be a breach of Landlord's covenant of quiet enjoyment.

17.3    <u>Limitation of Liability</u>.

Tenant specifically agrees to look solely to Landlord's then equity interest in the Building for recovery of any judgment from Landlord or Landlord Related Parties arising out of or in connection with this Lease or Tenant's occupancy of the Premises, it being specifically agreed that neither Landlord, nor any Landlord Related Parties, shall be required to respond in monetary damages from Landlord's assets other than Landlord's equity interest as aforesaid in the Building. This provision is not intended to be a measure or agreed amount of Landlord's liability with respect

-37-

to any particular breach, and shall not be utilized by any court or otherwise for the purpose of determining any liability of Landlord hereunder, except only as a maximum amount not to be exceeded in any event.

17.4    Force Majeure.

If either party hereto shall be delayed or hindered in or prevented from the performance of any non-monetary act by Force Majeure, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this Section 17.4 shall not operate to excuse Tenant from the prompt payment of Rent or any other payments required by the terms of this Lease and shall not operate to delay or extend the Lease Term. "Force Majeure" means strike, lockout, breakdown, accident, order or regulation of or by any governmental authority, or failure of supply, or inability by the exercise of reasonable diligence to obtain supplies, parts or employees necessary to furnish such services, or because of war, significant public health emergencies, such as pandemics (including a COVID-19 outbreak), or other emergency or for any cause due to any act or neglect of the other party.

17.5    Mechanics' and Other Items.

Tenant shall have no authority, express or implied, to create or place any lien or encumbrance of any kind or nature whatsoever upon, or in any manner to bind, the interest of Landlord or Tenant in the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant shall pay before delinquency all costs for alterations, maintenance, repair, replacement or other work done or caused to be done by Tenant in the Premises, shall keep the title to the Project and every part thereof free and clear of any lien or encumbrance in respect of such work and shall indemnify and hold harmless Landlord and Landlord's agents and employees against any claim, loss, cost, demand or legal or other expense, whether in respect of any lien or otherwise, arising out of the supply of material, services or labor for such work. Tenant shall immediately notify Landlord of any such lien, claim of lien or other action of which it has or reasonably should have knowledge and that affects the title to the Project or any part thereof, and shall cause the same to be removed by bonding or otherwise within twenty (20) days after notice of such filing, failing which Landlord may take such action as Landlord deems necessary to remove same and the entire cost thereof shall be immediately due and payable by Tenant to Landlord. If provided by applicable law, Tenant shall cause such postings to be made and notices given as shall prevent any mechanics' lien for work done for Tenant from attaching to the Project.

17.6    No Brokerage.

Landlord and Tenant each warrants and represents that it has dealt with no broker other than the Brokers identified in Section 1.2 in connection with the consummation of this Lease, and each agrees to indemnify and hold the other harmless from any other claims predicated upon a breach of its representation. Landlord shall be responsible for the payment of a brokerage fee to Brokers pursuant to a separate agreement between Landlord and Brokers.

-38-

17.7    Invalidity of Particular Provisions.

If any term or provision of this Lease, or the application thereof to any person or circumstance, shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforceable to the fullest extent permitted by law.

17.8    Provisions Binding.

Except as herein otherwise expressly provided, the terms hereof shall be binding upon and shall inure to the benefit of the successors and assigns, respectively, of Landlord and Tenant and, if Tenant shall be an individual, upon and to his or her heirs, executors, administrators, successors and assigns.  Each term or each provision of this Lease to be performed by Tenant shall be construed to be both a covenant and a condition.  The reference contained to successors and assigns of Tenant is not intended to constitute a consent to assignment by Tenant, but has reference only to those instances in which Landlord may later give consent to a particular assignment as required by those provisions of Article VI hereof.

17.9    Recording.

Both Landlord and Tenant agree not to record the within Lease, but each party hereto agrees, on the request of the other, to execute a so-called Notice of Lease or short form lease in form recordable and complying with applicable law and reasonably satisfactory to Landlord and Tenant.  In no event shall such document set forth the rental or other charges payable by Tenant under this Lease; and any such document shall expressly state that it is executed pursuant to the provisions contained in this Lease, and is not intended to vary the terms and conditions of this Lease.

17.10    Notices.

Whenever, by the terms of this Lease, notice shall or may be given either to Landlord or to Tenant, such notice shall be deemed to have been properly given if in writing and personally delivered or sent by registered or certified mail, postage prepaid return receipt requested, or overnight courier which provides evidence of delivery, addressed to Tenant at Tenant's address set forth on the first page of this Lease or addressed to Landlord at Landlord's address as set forth on the first page of this Lease, as the case may be, and such notice shall be deemed to have been delivered or received, as the case may be, (a) on the date of delivery, if personally delivered, (b) on the second business day following deposit in the mails, if sent by registered or certified mail, or (c) one (1) business day after deposit with the overnight carrier for next day delivery, if sent by overnight courier.  Landlord and Tenant shall have the right from time to time to specify as its address for purposes of this Lease any other address in the United States of America upon three (3) days' notice thereof, similarly given to the other party.  Any notice sent to Tenant by Landlord's attorney as set forth herein shall be deemed notice by Landlord and any notice sent to Landlord by Tenant's attorney shall be deemed notice by Tenant.

17.11    When Lease Becomes Binding.

-39-

Employees or agents of Landlord have no authority to make a lease or any other agreement or undertaking in connection herewith. The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Premises, and this document shall become effective and binding only upon the execution and delivery hereof by both Landlord and Tenant. All negotiations, considerations, representations and understandings between Landlord and Tenant, including specifically all representations with respect to possible construction and configuration of the Building and Project and all representations with respect to other present or proposed tenants of the Building and Project, are incorporated herein and may be modified or altered only by written agreement between Landlord and Tenant, and no act or omission of any employee or agent of Landlord shall alter, change or modify any of the provisions hereof.

17.12    Paragraph and Section Headings.

The paragraph and section headings and captions throughout this instrument are for convenience and reference only, and the words contained therein shall in no way be held to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Lease.

17.13    Rights of Mortgagee.

(a)    Subject to any mortgagee's or ground lessor's election, as provided for in Section 17.13(b) below, this Lease and the rights of Tenant hereunder are subject and subordinate in all respects to the lien of all mortgages and ground leases which may now or hereafter be placed on or affect all or any part of the real property of which the Premises are a part and/or Landlord's interest or estate in such real property or ground leases, and to each advance made and/or hereafter to be made under any such mortgages, and to all renewals, modifications, consolidations, replacements and extensions thereof and all substitutions therefor.

(b)    If any holder of a mortgage which encumbers the Premises shall so elect, this Lease, and the rights of Tenant hereunder, shall be superior to rights of such holder, with the same force and effect as if this Lease had been executed and delivered, and recorded, or a statutory notice hereof recorded, prior to execution, delivery and recording of any such mortgage. Any election under this Section 17.13(b) shall become effective upon either notice from such holder to Tenant in the same fashion as notices from Landlord to Tenant are to be given hereunder or by the recording in the appropriate registry or recorder's office of an instrument, in which such holder subordinates its rights under such mortgage to this Lease.

(c)    After receiving notice from any person, firm or other entity that it holds a mortgage or ground lease which includes the Premises as part of the mortgaged premises and including its notice address, no notice from Tenant to Landlord relating to a default of Landlord which might give rise to a termination of this Lease or a reduction of the rent hereunder shall be effective unless and until a copy of the same is given to such holder, and the curing of any of Landlord's defaults by such holder be treated as performance by Landlord.

(d)    With reference to any assignment by Landlord of Landlord's interest in this Lease, or the rents payable hereunder, conditional in nature or otherwise, which assignment is

-40-

made to the holder of a mortgage or ground lease on property which includes the Premises, Tenant agrees:

        i.      that the execution thereof by Landlord, and the acceptance thereof by the holder of such mortgage or ground lessor, shall never be treated as an assumption by such holder or ground lessor of any of the obligations of Landlord hereunder, unless such holder or ground lessor shall, by notice sent to Tenant, specifically otherwise elect; and

        ii.      that, except as aforesaid, such holder or ground lessor shall be treated as having assumed Landlord's obligations hereunder only upon foreclosure of such holder's mortgage, or, in the case of a ground lessor, the assumption of Landlord's position hereunder by such ground lessor.

        (e)      Where a party acquires the lessor's interest in property (whether land only, or land and buildings) which includes the Premises, and simultaneously leases the same back, such acquisition shall be treated as an assumption of Landlord's position hereunder, and this Lease shall thereafter be subject and subordinate at all times to such lease so long as Tenant receives an SNDA in accordance with the terms of Section 17.13(a) above.

        (f)      Following the full execution and delivery of this Lease, Landlord shall use reasonable efforts to deliver to Tenant an SNDA executed by the current Mortgagee in such current Mortgagee's standard form.

      17.14   Definition of "Gross Leasable Area".

The term **"Gross Leasable Area,"** as used herein, shall mean, with respect to each premises separately leased, the number of square feet of floor space on all floor levels in the premises including any mezzanine area, measured from the exterior faces of exterior walls, store fronts, walls fronting on enclosed malls or interior common areas and service areas, and the center lines of party walls or common partitions and walls fronting on corridors and service areas. No deduction or exclusion from gross leasable area shall be made for columns, stairs, elevators, escalators, shafts, or other interior construction.

      17.15   Estoppel Certificate.

Tenant shall, without charge, at any time and from time to time, within ten (10) business days after written request by Landlord, execute and deliver by written instrument which certifies to any mortgagee or proposed mortgagee, or any purchaser or proposed purchaser, or to any other third party entity reasonably specified by Landlord:

        i.      The Lease Commencement Date, the Rent Commencement Date, the Expiration Date, and the existence, number and term of any option periods.

        ii.      Whether or not Landlord is in default, in any way, in the performance of any of the covenants, conditions and agreements to be performed by Landlord in accordance with this Lease and if there is any such default, specifying the nature of same.

-41-

iii.    What the amount of Rent is pursuant to the terms of this Lease, and the dates, if any, to which the Minimum Rent and other charges hereunder have been paid in advance.

iv.    That this Lease is unmodified and in full force and effect, or in the event that there have been modifications, that the same is in full force and effect as modified and setting forth the modifications.

v.    Whether or not there are then existing any claims, setoffs or defenses against the enforcement of any of the agreements, terms, covenants or conditions hereof upon the part of Tenant to be performed or complied with, and if so, specifying the same.

vi.    The status of any other factual matter (exclusive of representations or covenants to the lender or purchaser) relative to this Lease which is customarily found in tenant estoppel certificates.

If Tenant shall fail to execute and return such statement, as so edited or revised by Tenant, within such ten business day period and such failure is not cured within five (5) business days after a second request from Landlord, such failure shall be deemed tantamount to the delivery of the certificate by Tenant to Landlord to the effect that this Lease is valid and in full force and effect and that no party at the time is in default under any of the terms of this Lease, and no advance payments have been made.

From time to time, within ten (10) business days following written request by Tenant, Landlord shall deliver to Tenant a written statement executed by Landlord (A) stating that this Lease is then in full force and effect and has not been modified (or if modified, setting forth all modifications), (B) setting forth the date to which Minimum Rent, all Additional Rent and any other items of Rent have been paid, (C) stating whether or not, to the best knowledge of Landlord, Tenant is in default under this Lease, and, if Tenant is in default, setting forth the specific nature of all such defaults, and (D) as to any other factual matters reasonably requested by Tenant and related to this Lease which are customarily provided estoppel certificates delivered by a landlord to a tenant.

17.16   Surrender of Premises.

On the expiration or earlier termination of the Term of this Lease, Tenant shall peaceably leave and surrender the Premises vacant, broom clean, in good order and condition, ordinary wear and tear and damage for which Tenant is not responsible under the terms of this Lease excepted, together with all Landlord-approved work, alterations and additions (including, without limitation, all heating, ventilating, air-conditioning, lighting and plumbing equipment and fixtures, except for decorative lighting fixtures, whether or not any such equipment or fixtures may otherwise be considered to be trade fixtures) which may have been made or installed in, on or to the Premises prior to or during the Term of this Lease, except for the usual signs, decorative lighting fixtures, trade fixtures (except as above provided), business equipment, furniture and other personal property (the "**Tenant's Property**") brought into the Premises at Tenant's sole cost and expense, which Tenant's Property shall be removed upon the expiration of the Term of this Lease.  Tenant agrees to repair any and all material damage to the Premises resulting from such removal. If Tenant

-42-

fails to perform any repairs or restoration as required hereunder, Landlord may do so, and Tenant shall pay Landlord the cost thereof upon demand. Any or all of the property to be removed by Tenant from the Premises on or before the expiration of the Term of this Lease which is not so removed five (5) business days after written notice from Landlord shall, at Landlord's option, either become the exclusive property of Landlord or may be disposed of by Landlord, at Tenant's cost and expense, without further notice to or demand upon Tenant. Tenant shall surrender all keys for the Premises to Landlord at the place then fixed for the payment of rent and shall inform Landlord of all combinations of locks, safes and vaults, if any, in the Premises.

17.17   Holding Over.

If Tenant shall continue to occupy the Premises or any portion thereof after expiration or sooner termination of this Lease, Tenant shall pay, as a charge for use and occupancy and liquidated damages (and not as Rent), on a per diem basis, an amount equal to one hundred fifty percent (150%) of the Rent payable immediately prior to the expiration or termination of this Lease for the first thirty (30) days of such holdover and two hundred percent (200%) of the Rent payable immediately prior to the expiration or termination of this Lease thereafter. Notwithstanding anything to the contrary contained in this Lease, if Tenant shall continue to occupy the Premises or any portion thereof for more than thirty (30) days after expiration or sooner termination of this Lease, Tenant shall also pay all damages, consequential as well as direct, sustained by Landlord on account of Tenant's holding over. No receipt of money by Landlord from Tenant after expiration or termination of this Lease shall reinstate or extend this Lease or affect any prior notice given by Landlord to Tenant, and it is acknowledged that Tenant has no right to hold over or to occupy the Premises after the termination hereof.

17.18   Intentionally Omitted.

17.19   Intentionally Omitted.

17.20   Governing Law.

This Lease shall be governed exclusively by the provisions hereof and by the laws of the State of Georgia, as said laws may from time to time exist.

17.21   Intentionally Omitted.

17.22   Intentionally Omitted.

17.23   Waiver of Trial By Jury.

TO THE FULLEST EXTENT ALLOWED BY LAW, LANDLORD AND TENANT DO HEREBY WAIVE THEIR RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER AGAINST THE OTHER UPON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM OF INJURY OR DAMAGE.

-43-

17.24   Business Methods.

Tenant agrees that Landlord shall have the right to prohibit the continued use by Tenant of any unethical or unfair method of business operation, advertising or interior display if, in Landlord's reasonable opinion, the continued use thereof would impair the reputation of the Building as a desirable place to shop or is otherwise out of harmony with the general character thereof, and upon notice from Landlord, Tenant shall forthwith refrain from and discontinue such activities.

17.25   Tenant Representations.

Tenant hereby covenants and warrants that the signatory executing this Lease on behalf of Tenant is duly authorized and empowered to execute and deliver this Lease on behalf of Tenant.

17.26   Independent Covenants.

Landlord and Tenant specifically agree that the obligations of Tenant and Landlord hereunder, including, without limitation, the obligation to pay Rent, and the obligations of the Landlord, are independent and not mutually dependent covenants and that failure of Landlord to perform any obligation hereunder shall not, except as may be expressly provided otherwise in this Lease, justify or empower Tenant to perform any obligation of Landlord hereunder or terminate this Lease, except as may be expressly provided hereunder.

17.27   Guaranty.

The obligations of Tenant and its successors and assigns under this Lease shall be guaranteed unto Landlord and Landlord's successors and assigns by Guarantor, pursuant to a written guaranty in the form attached hereto as **Exhibit H** (the "**Guaranty**"). Tenant shall deliver the original Guaranty executed by the Guarantor to Landlord concurrently with the execution and delivery of this Lease by Tenant.

17.28   Counterparts; Electronic Signatures.

This Lease may be signed in counterparts, each of which will be considered an original and all such counterparts will be considered and constitute one and the same agreement. This Lease may be delivered by facsimile transmission, by electronic mail, or by other electronic transmission, in portable document format (.pdf), or other electronic or facsimile format, and each such executed facsimile, .pdf, or other electronic record shall be considered an original executed counterpart for purposes of this Lease. Each party to this Lease (i) agrees that it will be bound by its own Electronic Signature (as such term is defined immediately below), (ii) accepts the Electronic Signature of each other party to this Lease, and (iii) agrees that such Electronic Signatures shall be the legal equivalent of manual signatures. The term "Electronic Signature" means (y) the signing party's manual signature on a signature page, converted by the signing party to facsimile or digital form (such as a .pdf file) and received from the signing party's customary email address, customary facsimile number, or other mutually agreed-upon authenticated source; or (z) the signing party's digital signature executed using a mutually agreed-upon digital signature service provider and digital signature process.

-44-

17.29   Attorney's Fees.  If legal action is instituted by either of the parties to enforce the terms of this Lease or arising out of the execution of this Lease, the prevailing party will be entitled to receive from the other party a reasonable attorney's fee to be determined by the court in which the action was brought.

17.30   Landlord/Tenant Relationship.  IT IS THE EXPRESS INTENT OF THE PARTIES THAT A LANDLORD/TENANT RELATIONSHIP IS ESTABLISHED BY THIS LEASE AND THAT NO ESTATE FOR YEARS OR OTHER ESTATE SHALL PASS OUT OF LANDLORD AS A RESULT OF THIS LEASE.  NOTHING CONTAINED HEREIN SHALL BE DEEMED OR CONSTRUED BY THE PARTIES HERETO, NOR BY ANY THIRD PARTY, AS CREATING THE RELATIONSHIP OF PRINCIPAL AND AGENT, PARTNERSHIP OR JOINT VENTURE BETWEEN THE PARTIES.

## ARTICLE XVIII.
## SECURITY DEPOSIT

18.1   Amount of Deposit.

The amount set forth in Section 1.2 as the Security Deposit is payable by Tenant to Landlord simultaneously with Tenant's execution and delivery of this Lease.  The Security Deposit shall be held by Landlord as security against any Event of Default by Tenant in the performance of the covenants, conditions and agreements of this Lease.   The Security Deposit may, at Landlord's option, be applied by Landlord after any Event of Default by Tenant under this Lease. Landlord's application of the Security Deposit (i) shall not cure or waive the underlying Event of Default, (ii) shall not, in any way, excuse Tenant from continuing the full, faithful and punctual performance of any and all of its obligations under the Lease, and (iii) shall be cumulative to and, in no way preclude Landlord from, any of the remedies at law or in equity otherwise available to Landlord.  Tenant hereby expressly acknowledges that the amount of the Security Deposit is not a measure of the damages that Landlord may suffer or a limit upon the damages Landlord may recover in the event of any failure or breach by Tenant with respect to any or all of the covenants, conditions and agreements of this Lease.  To the extent the Security Deposit is in the form of cash, Landlord shall not be obligated to keep such Security Deposit in a separate fund but may commingle the Security Deposit with its own funds.  Tenant irrevocably waives any claim that such a commingled Security Deposit is held in an actual or constructive trust for Tenant's benefit. If Landlord applies the Security Deposit in whole or in part against an Event of Default or any amount not paid by Tenant, then Tenant shall, within ten (10) business days after demand by Landlord, deposit sufficient funds to maintain the Security Deposit in the amount set forth in Section 1.2.  The failure of Tenant to maintain the Security Deposit in the amount set forth in Section 1.2 shall constitute a failure to pay Rent and shall carry with it the consequences set forth under Article XVI hereof.  Upon the expiration of the Term hereof, the Security Deposit, to the extent not applied toward the payment of Rent in arrears or toward the payment of damages suffered by Landlord by reason of Tenant's breach of this Lease, is to be returned to Tenant without interest, but in no event is such Security Deposit to be returned until Tenant has vacated the Premises, delivered possession thereof to Landlord, and fully satisfied Tenant's obligations under this Lease. Tenant shall not mortgage, assign, transfer or encumber the Security Deposit, and any such mortgage, assignment, transfer or encumbrance shall be without any force or effect and shall

-45-

not be binding upon Landlord in any event. Landlord shall have the right, with notice to Tenant, to transfer or assign the Security Deposit to its lender or to any grantee or grantees to whom Landlord may convey the Premises, and on such transfer, Landlord shall be relieved from all further liability to Tenant with respect to the Security Deposit, and Tenant shall thereafter look only to such grantee for the return of the Security Deposit. A mortgagee-in-possession or other lender of the Premises, or any interest therein, through public or private foreclosure or the acceptance of a deed in lieu thereof, shall have no liability to Tenant for return of all or any portion of the Security Deposit, unless, and then only to the extent that, such mortgagee or other lender has received all or any portion of the Security Deposit.

*[The remainder of this page intentionally left blank. Signature page follows.]*

IN WITNESS WHEREOF, the parties hereto have set their hands and seals in five (5) counterpart copies, each of which counterpart copy shall be deemed an original for all purposes, as of the date and year first above written.

LANDLORD:

NORTHLAND CHAMBLEE LLC,
a Delaware limited liability company

By: _Beth Kinally_
Name: Beth Ainslee
Title: Assistant Secretary

TENANT:

QIAN YUAN SERVICE, LLC,
a Georgia limited liability company

By: _____
Name: Yun Zheng
Title: Managing Member

-47-

EXHIBIT A

Plan Showing the Premises



EXHIBIT A-1

Plan Showing the Project



Malone Dr

-2-

## EXHIBIT B

### Rules and Regulations

(a)    The sidewalks (except as expressly provided in this Lease), entrances, driveways, passages, courts, elevators, vestibules, stairways, corridors or halls shall not be obstructed or used for any purpose other than for ingress to and egress from the Premises and for delivery of merchandise and equipment in a prompt and efficient manner, using elevators and passageways designated for such delivery by Landlord. There shall not be used in any space, or in public hall of the Building or the Project, either by any Tenant or by jobbers or others in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and sideguards.

(b)    The water and wash closets and plumbing fixtures shall not be used for any purposes other than those for which they were designed or constructed and no sweepings, rubbish, rags, acids, chemicals, or other substances shall be deposited therein, and the expense of any breakage, stoppage, or damage resulting from the violation of this rule shall be borne by the Tenant who, or whose clerks, agents, employees or visitors, shall have caused it.

(c)    No carpet, rug or other article shall be hung or shaken out of any window of the Building; and no Tenant shall sweep or throw or permit to be swept or thrown from the Premises any dirt or other substances into any of the corridors or halls, elevators, or out of the doors or windows or stairways of the Building, and Tenant shall not use, keep or permit to be used or kept any foul or noxious gas or substance in the Premises, or permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to Landlord and other occupants of the Building or Project by reason of noise, odors and/or vibrations, or interfere in any way with other tenants or those having business therein, nor shall any animals or birds be kept in or about the Building or Project. Smoking or carrying lighted cigars or cigarettes in the Building is prohibited.

(d)    Except for Tenant's express signage rights under the Lease, and specifically subject to all provisions set forth in the Lease, no showcases, sales tables, merchandise displays, signs or other articles shall be placed in front of or affixed to any part of the exterior of the Building or Project, nor placed in the halls, common passageways, corridors or vestibules without the prior written consent of Landlord.

(e)    Except as otherwise permitted by the Signage Guidelines or as otherwise approved by Landlord in writing, no awnings, antennae, or other projections shall be attached to the outside walls of the Building.

(f)    Except as otherwise approved by Landlord in writing, no curtains, blinds, shades, or screens other than those furnished by Landlord shall be attached to, hung in or used in connection with any window or door of the Premises without the prior written consent of Landlord.

(g)    Except for Tenant's express signage rights under the Lease, no sign, signal, blinking or flashing lights, advertisement, notice or other lettering shall be exhibited, inscribed, painted or affixed by any Tenant on any part of the outside of the Premises or the Building or

Project or on the inside of the Premises if the same is visible from the outside of the Premises without the prior written consent of Landlord. Landlord may, subject to the notice and cure provisions contained in Section 16.1(c) of the Lease, remove same without any liability, and may charge the expense incurred by such removal to Tenant or tenants violating this rule. Interior signs on doors and directory tablet shall be inscribed, painted or affixed for each tenant by Landlord and shall be of a size, color and style acceptable to Landlord. No handwritten signs shall be permitted in tenant's store windows.

(h)    Intentionally omitted.

(i)    No additional locks or bolts of any kind shall be placed upon any of the doors or windows by any Tenant, nor shall any changes be made in existing locks or mechanism thereof. Each Tenant must, upon the termination of his tenancy, restore to Landlord all keys of stores, offices, toilet rooms, and compactor, either furnished to, or otherwise procured by, such Tenant, and in the event of the loss of any keys, so furnished, such Tenant shall pay to Landlord the cost thereof.

(j)    Intentionally omitted.

(k)    Canvassing, soliciting and peddling outside of any tenant's premises is prohibited and each tenant shall cooperate to prevent the same.

(l)    No space in the Building or Project shall be used for manufacturing (which shall not be deemed to include food preparation) or for the sale at auction of merchandise, goods or property of any kind.

(m)    Landlord shall have the right to prohibit any advertising by any Tenant which, in Landlord's opinion, is offensive or tends to impair the reputation of the Building or Project or its desirability as a Building or Project for offices and retail premises, and upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising.

(n)    Tenant shall comply with all security measures from time to time established by Landlord for the Building and the Project.

(o)    Tenant assumes full responsibility for protecting its space from theft, robbery and pilferage, which includes keeping doors locked and any other means of entry to the premises closed and secured when closed.

(p)    Tenant shall comply with all applicable federal, state and municipal laws, ordinances and regulations and Building and Project rules and shall not, directly or indirectly, make any use of the Premises, the Building or the Project which may be prohibited by any thereof or which shall be dangerous to person or property or shall increase the cost of insurance or require additional insurance coverage.

(q)    Tenant shall not install and operate machinery or any mechanical devices of a nature not directly related to Tenant's ordinary use of the Premises without the written permission of Landlord.

-2-

EXHIBIT B-1

Construction Rules and Regulations

---

**NORTHLAND INVESTMENT CORPORATION – SLX
CONTRACTOR'S POLICIES**

1. Contractors, their sub-contractors and their employees must wear shirts and shoes at all times.
2. Contractors must maintain the following list of items on the job site at all times:
   a. MSDS sheets for all glues, solvents, paints, and any other potentially hazardous material.
   b. Full set of project drawings and specifications
   c. First aid kit
   d. Safety equipment
3. Contractors, their sub-contractors and their employees shall not begin work without all necessary permits. Contractor is responsible for obtaining any permits necessary permits. Permits are to be submitted to Northland Investment Corporation. Similarly, the General Contractor is responsible for maintaining and providing copies to Building Management of current certificates of insurance from all subcontractors.
4. Contractor shall provide a construction schedule and list of all subcontractors to Building Management prior to the start of construction.
5. Contractor shall have a Superintendent at the Project Site at all times during Construction.
6. All construction material deliveries must be made directly to the leased space.
7. Building Management must be notified 24 hours in advance in writing of any work scheduled before or after regular business hours (8:00 a.m. to 5:00 p.m.).
8. All mechanical, electrical and plumbing work must conform to building standards. Air-balancing must be contracted separately from the HVAC contract and under the direct responsibility of the General Contractor. Building management must approve any deviation in advance.
9. All construction locks are to be of Building Standard and keyed to the building master.
10. Contractors, their sub-contractors and their employees are not permitted to smoke while on the premises.
11. No materials may be stored in stairwells or any public areas of the building.
12. Contractor shall schedule all work that may disturb building tenants and residents after 8:00 a.m. and no later than 5:00 p.m., to include, but not be limited to:
    a. Work in adjacent tenant spaces
    b. Work in core area
    c. Stud track installation
    d. Sprinkler shutdowns
    e. Certain carpet and VCT adhesive applications
    f. Structural reinforcing work
    g. Electrical shutdowns
    h. Fire Alarm Work
    i. Demolition
    j. Painting (based on odor migration)
    Management reserves the right to require Contractor to cease operations, which inconveniences or disturbs tenants.
13. When work is required in adjacent tenant spaces or the core area, scheduling will be coordinated through Building Management. Contractor's Superintendent shall be present and responsible at all times. All protection and clean up is the responsibility of the Contractor.
14. Contractor is responsible for properly isolating fire system controls while doing any work that may trip alarms. Contractor shall be responsible for paying any fines, which may be occurred by false alarms.
15. Construction safety standards to be followed at all time (i.e., construction warning tape to be used at any possible hazardous areas). When using any open flame, a fire extinguisher must be within reach and a "spotter" must be present.
16. Contractor shall coordinate all sprinkler/fire alarm shutdowns and interruptions of utilities with Northland Investment Corporation. 24-hour written notice is required.
17. At the conclusion of construction, and as a precedent to substantial completion, Contractor shall:
    a. Provide a complete set of "as built" drawings
    b. Clean all surfaces to a "final" clean condition
    c. Any work done at the electric panels must be clearly and accurately labeled.
18. The Contractor is responsible for obtaining a construction dumpster, which must be coordinated with building Management prior to delivery. No construction debris is to be placed in the building's compactor. Trash and debris must be discarded daily. Absolutely no food or food containers are to be left overnight.
19. Smoke detectors must be covered beforehand and removed immediately upon completion of work. All sweeping must be done with a sweeping compound.
20. Contractor may not deviate from building standard procedures, equipment or material without Landlord's written permission.

Page 1 of 2

4870-9795-2549, v. 4

## NORTHLAND INVESTMENT CORPORATION – SLX
## CONTRACTOR'S POLICIES

21. Contractors, their sub-contractors and their employees may not play radios on the premises.
22. Contractors, their sub-contractors and their employees may not use profane language while on the premises and must always be courteous to tenants.
23. Parking is not guaranteed without prior written agreement of property manager.
24. Contractors, their sub-contractors and their employees may not use any building owned tools or equipment without prior written approval of the manager.
25. Contractors must sign out keys through Building Management. Contractors will be responsible for lost keys.
26. Contractors, their sub-contractors and their employees are responsible for removing equipment, supplies and trash from their work area at the end of each day.
27. Contractors are responsible for damages caused by negligence or oversight.
28. Contractors are responsible for the removal of all debris caused or associated with the work being performed by the contractor, unless otherwise stated in a written contract.
29. Contractors are responsible for submitting to the manager, before work begins, proof of liability and workmen's compensation insurance.
30. Contractors are responsible for taking all necessary precautions and to have all utility lines marked prior to beginning work.
31. Contractors are responsible for keeping their work areas clearly marked, neat and orderly. Proper barricades, caution tape, signs, etc. MUST BE USED AT ALL TIMES!
32. Contractors are responsible to communicate with property manager on all fire alarm activity with 24 hours notice.
33. Contractors, their sub-contractors and their employees are responsible to maintain all work in conformity with local fire regulations. Hot work (welding, brazing, is not permitted without consent of community manager.

**The property and its management company reserve the right to dismiss any contractor or contractor's employee at any time.**

_____          _____
Signature                                               Date

_____
Title

Page 2 of 2

-4-

4870-9795-2549, v. 4

EXHIBIT C

Work Letter

1.      Preparation of Plans.  Tenant is currently preparing, at its sole cost and expense, plans and specifications for the improvements Tenant desires to make in connection with Tenant's occupancy of the Premises (the "**Plans**"). The Plans shall be submitted to Landlord for Landlord's approval (such approval not to be unreasonably withheld or delayed) no later than thirty (30) days from the date hereof, and Landlord shall approve or disapprove of the Plans within ten (10) Business Days after receiving them.  Any disapproval by Landlord of the Plans shall be accompanied by a reasonably specific statement of reasons therefor.  Tenant shall cause the Plans to be revised in a manner sufficient to remedy Landlord's objections and/or respond to Landlord's concerns and shall resubmit the revised the Plans to Landlord, and Landlord shall either approve or disapprove of the revised Plans within five (5) Business Days following the date of resubmission.  If Landlord shall again disapprove of the Plans, Tenant shall again revise such plans and resubmit them to Landlord pursuant to the foregoing procedures until  the Plans have been approved by Landlord. The Plans shall be stamped by a Georgia-registered architect and engineer, such architect and engineer being subject to Landlord's approval in Landlord's reasonable discretion, and shall comply with all applicable laws, ordinances and regulations (including, without limitation, the applicable requirements of the Americans with Disabilities Act of 1990 and applicable state accessibility requirements, as amended from time to time, and the regulations promulgated thereunder) and the requirements of the Rules and Regulations and shall be in a form satisfactory to appropriate governmental authorities responsible for issuing permits, approvals and licenses required for construction.  Landlord reserves the right to require Tenant to use Landlord's engineer to prepare all engineering plans and drawings for the structural, mechanical, electrical, plumbing, HVAC, life safety, and sprinkler portions of Tenant's Work. Tenant acknowledges and agrees that any review or approval by Landlord of any plans and/or specifications with respect to Tenant's Work is solely for Landlord's benefit, and without any representation or warranty whatsoever to Tenant with respect to the adequacy, correctness or efficiency thereof or otherwise.

2.      Performance of Tenant's Work.  Promptly after the Lease Commencement Date, Landlord's approval of the Plans (the "**Approved Plans**") and receipt by Tenant of all required permits and approvals, Tenant shall commence and exercise all reasonable efforts to complete the work specified therein ("**Tenant's Work**").  All of Tenant's Work shall be completed in accordance with the Approved Plans and the requirements for alterations and improvements made by or on behalf of Tenant set forth in this Lease and in the Rules and Regulations. Tenant's Work shall be performed by a general contractor approved by Landlord, which approval shall not be unreasonably withheld or delayed, under a written construction contract.  The approval by Landlord of Tenant's general contractor shall not impose upon Landlord any responsibility or liability whatsoever to Tenant as a result of, or arising out of, the defaults or other acts or omissions of the general contractor.  Prior to commencing Tenant's Work, Tenant shall obtain and provide Landlord with copies of, all state, local and other necessary permits and shall carry such insurance (naming Landlord, Landlord's property manager, any mortgagee and any other parties reasonably designated by Landlord as additional insureds).  In addition, Landlord may monitor the progress of Tenant's Work, including, without limitation, attend any weekly or other periodic job meetings.  Any review and monitoring of Tenant's Work by Landlord shall not impose upon

Landlord any responsibility or liability whatsoever to Tenant as a result of, or arising out of, Tenant's Work. Within forty-five (45) days after completion of any Tenant's Work, Tenant shall provide to Landlord "as-built" plans of the Tenant's Work. Tenant shall provide Landlord with copies of the certificate of occupancy for any Tenant's Work that requires a certificate of occupancy reasonably promptly after completion of such Tenant's Work. Nothing herein shall be construed as permitting Tenant to occupy all or any portion of the Premises for which Tenant has not obtained a certificate of occupancy or otherwise failed to comply with applicable legal requirements.

       3.    <u>Landlord's Contribution</u>. Landlord shall reimburse Tenant for the hard costs incurred by Tenant with respect to the performance of Tenant's Work (the **"Cost of Tenant's Work"**) up to the amount of Landlord's Contribution, provided that a requisition is submitted by Tenant in accordance with the provisions of this <u>Exhibit C</u> on or before the date that is twelve (12) months after the Commencement Date. The Costs of Tenant's Work shall not include costs arising from an Event of Default or from any facts or circumstances that could become an Event of Default, such as legal fees or bonding costs arising in connection with a mechanic's lien placed on the Premises or Tenant's interest therein. Tenant shall be entirely responsible for any excess. Landlord shall not be obligated to disburse funds for materials stored off-site. Landlord's Contribution shall be payable by Landlord to Tenant (or, at Landlord's election, directly to Tenant's contractor) within forty-five (45) days after final completion in a manner satisfactory to Landlord's architect, receipt of a certificate of occupancy, and Tenant opening for business to the general public in the Premises. In any case, prior to payment of amounts Tenant shall deliver to Landlord a written request, which shall be accompanied by: (i) invoices for Tenant's Work covered such requisition; (ii) copies of final lien waivers; (iii) a certificate signed by the Tenant's architect certifying that Tenant's Work represented by the aforementioned invoices has been completed substantially in accordance with the Approved Plans; (iv) a certificate of substantial completion, certificate of occupancy, and as-built plans for Tenant's Work; and (v) all other information and materials reasonably requested by Landlord.

4870-9795-2549, v. 4

EXHIBIT D

Restricted Uses and Prohibited Uses

i.    Restricted Uses.  No portion of the Premises may be used for

    o    (a)    (Orange Theory) – a membership based fitness facility of any type,
            indoor/outdoor boot camp style fitness facility or instruction personal or group
            fitness studio as its primary lease

    o    (b)    (Bodyzilian Wax) – waxing services for female or male clients

    o    (c)    _____

ii.    Prohibited Uses.  The following uses (collectively referred to as "**Prohibited Uses**"
        and individually as a "**Prohibited Use**") are prohibited during the Term in the
        Project (or, as applicable, in designated portions thereof):

    (a)    manufacturing facility;

    (b)    any central laundry, dry cleaning plant performing on-site dry cleaning, or
            laundromat; provided, however, this prohibition shall not be applicable to
            on-site service oriented to pickup and delivery by the ultimate consumer,
            including nominal supporting facilities, nor shall this prohibition be
            applicable to any on-site laundry facility serving the residential tenants of
            the Building so long as such facility is not in ground floor retail space in
            the Project;

    (c)    any gasoline or service station, automotive service or repair business
            (provided that auto parts stores shall be permitted as long as no on-site
            repair services are offered);

    (d)    any marijuana dispensary (medical or otherwise) or any other facility
            distributing narcotics or pharmaceuticals (except for a licensed pharmacy
            within a drug store such as CVS, Walgreens or Rite Aid and except for
            Tenant's sale of non-prescription pharmacy products);

    (e)    any "second hand" store, used clothing or thrift store, pawn shop,
            salvation army type store, "surplus" store or liquidation outlet with the
            exception of "Designer Consignment" shops, which shall be permitted;

    (f)    massage parlor (provided that this restriction shall not apply to massage
            services provided by massage therapists (licensed if required by applicable

law) in connection with a day spa, fitness center, physical therapy or rehabilitation office, or to a first-class, massage concept, such as Massage Envy) or otherwise ancillary to a business which is not prohibited;

(g)     a cinema, theater, video store or bookstore selling, renting or exhibiting primarily material of a pornographic or adult nature;

(h)      an adult entertainment bar or club;

(i)     mortuary or funeral parlor;

(j)     dance hall or discotheque;

(k)     bowling alley, roller skating or ice skating rink; a pinball, video game, or any form of entertainment arcade; and

(l)     any facility primarily serving as a church, synagogue or other religious facility.

## EXHIBIT E

## Intentionally Omitted

## EXHIBIT F

## Intentionally Omitted

## EXHIBIT G

## Roof Plan



EXHIBIT H

Form of Guaranty

## GUARANTY

This Guaranty is made by YUN ZHENG, with an address of _____ ("**Guarantor**") in favor of NORTHLAND CHAMBLEE LLC, a Delaware limited liability company (hereinafter called "**Landlord**"), having an office of c/o Northland Investment Corporation, 2150 Washington Street, Newton, MA 02462-1443, with respect to that certain Lease Agreement dated _____ __, 2022 (the "**Lease**") between Landlord and Qian Yuan Service, LLC ("**Tenant**"), covering certain space in the building located at and numbered 5211 Peachtree Boulevard, Chamblee, Georgia. In order to induce Landlord to enter into the Lease, Guarantor hereby guarantees, unconditionally and absolutely, to Landlord, its successors and assigns (without requiring any notice of nonpayment, nonkeeping, nonperformance or nonobservance or proof of notice or demand whereby to charge Guarantor, all of which Guarantor hereby expressly waives), the full and faithful keeping, performance and observance of all the covenants, agreements, terms, provisions and conditions of the Lease provided to be kept, performed and observed by Tenant (expressly including, without being limited to, the payment as and when due of the basic rent, additional rent, charges and damages payable by Tenant under the Lease) and the payment of any and all other damages for which Tenant shall be liable by reason of any act or omission contrary to any of said covenants, agreements, terms, provisions or conditions (collectively the "**Obligations**"). Notwithstanding the foregoing, after the first five (5) Lease Years, provided that the Tenant is not then in default under the Lease, Guarantor's Obligations under this Guaranty shall be capped at twelve (12) months of the then applicable Minimum Rent and Additional Rent next payable under the Lease.

As a further inducement to Landlord to enter into the Lease and in consideration thereof, Guarantor represents and warrants that (A) Guarantor is the Managing Member of Tenant and (B) this Guaranty has been duly authorized by all necessary corporate action on Guarantor's part, has been duly executed and delivered by a duly authorized officer, and constitutes Guarantor's valid and legally binding agreement in accordance with its terms.

As a further inducement to Landlord to enter into the Lease and in consideration thereof, Guarantor hereby expressly covenants and acknowledges as follows:

(1)      This Guaranty and the obligations of Guarantor hereunder shall be continuing and irrevocable until Tenant has performed all of its Obligations, including those which survive the expiration or earlier termination of the Lease. If all or any portion of the Obligations are paid or performed, Guarantor's obligations hereunder shall continue and remain in full force and effect in the event that all or any part of such payment or performance is avoided or recovered directly or indirectly from Landlord as a preference, fraudulent transfer or

otherwise. This Guaranty and the obligations of Guarantor hereunder shall continue during any option period, extended term, or renewal period.

(2)    Guarantor hereby waives its right to assert any defense to its liability under this Guaranty based on (a) Guarantor's right to require Landlord to proceed against Tenant or a co-guarantor or to proceed against or exhaust any security held by Landlord at any time; (b) any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person or persons or the failure of Landlord to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons; (c) Landlord's failure to make any demand for performance or to give a notice of nonperformance to Tenant; (d) any defense based upon an election of remedies by Landlord, including any election which destroys or impairs any right of subrogation, reimbursement or contribution which Guarantor may have; (e) any duty on the part of Landlord to disclose to Guarantor any facts Landlord may now or hereafter know about Tenant, it being understood and agreed that Guarantor is fully responsible for becoming and remaining informed of the financial condition of Tenant and of any and all circumstances bearing on the risk of nonperformance of any Obligation; (f) any transfer of Landlord's interest in the Premises or the assignment of Landlord's interest in the Lease; (g) any transfer of Tenant's interest as tenant under the Lease or any portion thereof or any sublease or assignment by Tenant; (h) any merger or consolidation of Tenant or sale of all or a substantial portion of Tenant's assets; or (i) any prior or concurrent representation, understanding, promise or condition concerning the subject matter hereof which is not expressed herein. Guarantor hereby waives all presentments, protests, notices of protest, notices of dishonor and notices of acceptance of this Guaranty by Landlord, and this Guaranty shall be binding upon Guarantor immediately upon its delivery to Landlord.

(3)    Guarantor's liability under this Guaranty shall not be deemed to have been waived, released, discharged, limited, impaired or affected by reason of (a) the expiration or termination of the Lease; (b) the release or discharge of Tenant in any receivership, bankruptcy or other creditors' proceedings or the rejection, disaffirmance or disclaimer of the Lease by any party in any such proceeding; (c) the repossession of the Premises; (d) any amendment, extension, renewal or modification of the terms of the Lease without Guarantor's consent; or (e) any waiver by Landlord of any provisions of the Lease or any failure by Landlord to enforce the provisions thereof. Guarantor hereby assigns to Landlord any rights Guarantor may have to file a claim and proof of claim in any bankruptcy or similar proceeding of Tenant and any awards or payments thereon to which Guarantor would otherwise be entitled, to the extent of any unsatisfied Obligation. Guarantor hereby subordinates any and all claims it may have against Tenant to Landlord's claims under the Lease.

(4)    The liability of Guarantor is coextensive with that of Tenant and also joint and several with Tenant, and action or suit may be brought against Guarantor and carried to final judgment and/or completion and recovery had, either with or without making Tenant or any co-guarantor a party thereto. Insofar as the payment by Tenant of any sums of

money to Landlord is involved, this Guaranty is guaranty of payment and not of collection and shall remain in full force and effect until payment in full to Landlord of all sums payable under the Lease.

(5)      If two or more individuals, corporations, partnerships or other business associations (or any combination of two or more thereof) shall sign this Guaranty as Guarantor, the liability of each such individual, corporation, partnership or other business association hereunder shall be deemed to be joint and several, and all notices, payments and agreements given or made by, with or to any one of such individuals, corporations, partnerships or other business associations shall be deemed to have been given or made by, with or to all of them.

(6)      Any contemporaneous, prior or subsequent guaranty to Landlord shall not be deemed to be in lieu of or to supersede or terminate this Guaranty unless otherwise expressly provided either therein or herein, but shall be construed as an additional or supplementary guaranty, unless otherwise expressly provided herein.

(7)      Neither the giving nor the withholding by Landlord of any consent or approval provided for in the Lease shall affect in any way the obligations hereunder of Guarantor.

(8)      Neither Guarantor's obligation to make payment in accordance with the terms of this Guaranty nor any remedy for the enforcement thereof shall be impaired, modified, changed, stayed, released or limited in any manner whatsoever by any impairment, modification, change, release, limitation or stay of the liability of Tenant or its estate in bankruptcy or any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the Bankruptcy Code of the United States or other statute or from the decision of any court interpreting any of the same, and Guarantor shall be obligated under this Guaranty as if no such impairment, stay, modification, change, release or limitation had occurred.

(9)      This Guaranty, and all of the terms hereof, shall be binding on Guarantor and the successors, assigns, and legal representatives of Guarantor.

(10)      Guarantor hereby waives the right to trial by jury in any action or proceeding that may hereafter be instituted by Landlord against Guarantor in respect of this Guaranty.

(11)      If Landlord prevails in any proceeding with respect to the enforcement of this Guaranty, Guarantor will pay upon demand to Landlord all Landlord's expenses, including, but not limited to, reasonable attorneys' fees, in enforcing this Guaranty.

(12)      Should any provision of this Guaranty be determined to be illegal or unenforceable by a court of competent jurisdiction, all other provisions hereof shall nevertheless be deemed effective.

(13)    No provision of this Guaranty or right of Landlord hereunder may be modified or waived, nor shall Guarantor be released from performance of Guarantor's obligations hereunder, except by a writing duly executed by Landlord, except as otherwise provided herein.

(14)    The acceptance by Landlord of the performance of any of the Obligations under the Lease by Guarantor, including, without limitation, the acceptance of rent payments, shall constitute neither an assignment of the Lease to Guarantor nor Landlord's consent to such an assignment.

(15)    Guarantor, from time to time within ten (10) days following Landlord's written request, shall execute and deliver to Landlord such further reasonable instruments or documentation as may reasonably be requested by Landlord to ratify and confirm this Guaranty and the continuing liability of Guarantor hereunder solely as required in connection with a sale or financing of the Building.

(16)    This Guaranty shall be governed by and construed in accordance with the laws of the State of Georgia (without regard to conflicts of law rules). The parties hereby consent to jurisdiction and venue in any Georgia court of competent jurisdiction in which the Premises are located, and agree that such court shall constitute the exclusive venue for any dispute arising hereunder. Guarantor further hereby irrevocably and unconditionally waives any objection to the laying of venue of any such dispute, action or proceeding in the courts of the State of Georgia in which the Premises are located, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such dispute, action or proceeding brought in any such court has been brought in an inconvenient forum. Guarantor further agrees that service of any process, summons, notice or document by U.S. registered mail to the address set forth above shall be effective service of process for any dispute, action or proceeding brought against Guarantor in any such court.

(17)    This Guaranty contains all of the agreements of Landlord and Guarantor concerning the guaranty of the Lease and no prior or contemporaneous agreement or understanding pertaining to any such matter shall be effective.

(18)    Any notice given hereunder shall be in writing and may be given by certified mail, return receipt requested, personal delivery, Federal Express or other delivery service. If notice is given by certified mail, return receipt requested, notice shall be deemed given three (3) days after the notice has been deposited in the U.S. mail, postage pre-paid, addressed to Guarantor at the address set forth above and addressed to Landlord at the address for notices for Landlord set forth in the Lease. If notice is given by personal delivery, Federal Express or other delivery service, notice shall be deemed given on the date the notice is actually received by Landlord or Guarantor. Either party may, by written notice to the other party, specify a different address for notice purposes.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty under seal as of the date written below.

Dated: July __, 2022

GUARANTOR

By: _____

Yun Zheng

## GUARANTY

This Guaranty is made by YUN ZHENG, with an address of 472 Rutlidge Park Ln, Suwanee, GA 30024 ("**Guarantor**") in favor of NORTHLAND CHAMBLEE LLC, a Delaware limited liability company (hereinafter called "**Landlord**"), having an office of c/o Northland Investment Corporation, 2150 Washington Street, Newton, MA 02462-1443, with respect to that certain Lease Agreement dated August 3, 2022 (the "**Lease**") between Landlord and Qian Yuan Service, LLC ("**Tenant**"), covering certain space in the building located at and numbered 5211 Peachtree Boulevard, Chamblee, Georgia. In order to induce Landlord to enter into the Lease, Guarantor hereby guarantees, unconditionally and absolutely, to Landlord, its successors and assigns (without requiring any notice of nonpayment, nonkeeping, nonperformance or nonobservance or proof of notice or demand whereby to charge Guarantor, all of which Guarantor hereby expressly waives), the full and faithful keeping, performance and observance of all the covenants, agreements, terms, provisions and conditions of the Lease provided to be kept, performed and observed by Tenant (expressly including, without being limited to, the payment as and when due of the basic rent, additional rent, charges and damages payable by Tenant under the Lease) and the payment of any and all other damages for which Tenant shall be liable by reason of any act or omission contrary to any of said covenants, agreements, terms, provisions or conditions (collectively the "**Obligations**"). Notwithstanding the foregoing, after the first five (5) Lease Years, provided that the Tenant is not then in default under the Lease, Guarantor's Obligations under this Guaranty shall be capped at twelve (12) months of the then applicable Minimum Rent and Additional Rent next payable under the Lease.

As a further inducement to Landlord to enter into the Lease and in consideration thereof, Guarantor represents and warrants that (A) Guarantor is the Managing Member of Tenant and (B) this Guaranty has been duly authorized by all necessary corporate action on Guarantor's part, has been duly executed and delivered by a duly authorized officer, and constitutes Guarantor's valid and legally binding agreement in accordance with its terms.

As a further inducement to Landlord to enter into the Lease and in consideration thereof, Guarantor hereby expressly covenants and acknowledges as follows:

(1)     This Guaranty and the obligations of Guarantor hereunder shall be continuing and irrevocable until Tenant has performed all of its Obligations, including those which survive the expiration or earlier termination of the Lease. If all or any portion of the Obligations are paid or performed, Guarantor's obligations hereunder shall continue and remain in full force and effect in the event that all or any part of such payment or performance is avoided or recovered directly or indirectly from Landlord as a preference, fraudulent transfer or otherwise. This Guaranty and the obligations of Guarantor hereunder shall continue during any option period, extended term, or renewal period.

(2)     Guarantor hereby waives its right to assert any defense to its liability under this Guaranty based on (a) Guarantor's right to require Landlord to proceed against Tenant or a co-guarantor or to proceed against or exhaust any security held by Landlord at any time; (b) any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person or persons or the failure of Landlord to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons; (c)

Landlord's failure to make any demand for performance or to give a notice of nonperformance to Tenant; (d) any defense based upon an election of remedies by Landlord, including any election which destroys or impairs any right of subrogation, reimbursement or contribution which Guarantor may have; (e) any duty on the part of Landlord to disclose to Guarantor any facts Landlord may now or hereafter know about Tenant, it being understood and agreed that Guarantor is fully responsible for becoming and remaining informed of the financial condition of Tenant and of any and all circumstances bearing on the risk of nonperformance of any Obligation; (f) any transfer of Landlord's interest in the Premises or the assignment of Landlord's interest in the Lease; (g) any transfer of Tenant's interest as tenant under the Lease or any portion thereof or any sublease or assignment by Tenant; (h) any merger or consolidation of Tenant or sale of all or a substantial portion of Tenant's assets; or (i) any prior or concurrent representation, understanding, promise or condition concerning the subject matter hereof which is not expressed herein. Guarantor hereby waives all presentments, protests, notices of protest, notices of dishonor and notices of acceptance of this Guaranty by Landlord, and this Guaranty shall be binding upon Guarantor immediately upon its delivery to Landlord.

(3)     Guarantor's liability under this Guaranty shall not be deemed to have been waived, released, discharged, limited, impaired or affected by reason of (a) the expiration or termination of the Lease; (b) the release or discharge of Tenant in any receivership, bankruptcy or other creditors' proceedings or the rejection, disaffirmance or disclaimer of the Lease by any party in any such proceeding; (c) the repossession of the Premises; (d) any amendment, extension, renewal or modification of the terms of the Lease without Guarantor's consent; or (e) any waiver by Landlord of any provisions of the Lease or any failure by Landlord to enforce the provisions thereof. Guarantor hereby assigns to Landlord any rights Guarantor may have to file a claim and proof of claim in any bankruptcy or similar proceeding of Tenant and any awards or payments thereon to which Guarantor would otherwise be entitled, to the extent of any unsatisfied Obligation. Guarantor hereby subordinates any and all claims it may have against Tenant to Landlord's claims under the Lease.

(4)     The liability of Guarantor is coextensive with that of Tenant and also joint and several with Tenant, and action or suit may be brought against Guarantor and carried to final judgment and/or completion and recovery had, either with or without making Tenant or any co-guarantor a party thereto. Insofar as the payment by Tenant of any sums of money to Landlord is involved, this Guaranty is guaranty of payment and not of collection and shall remain in full force and effect until payment in full to Landlord of all sums payable under the Lease.

(5)     If two or more individuals, corporations, partnerships or other business associations (or any combination of two or more thereof) shall sign this Guaranty as Guarantor, the liability of each such individual, corporation, partnership or other business association hereunder shall be deemed to be joint and several, and all notices, payments and agreements given or made by, with or to any one of such individuals, corporations, partnerships or other business associations shall be deemed to have been given or made by, with or to all of them.

(6)     Any contemporaneous, prior or subsequent guaranty to Landlord shall not be deemed to be in lieu of or to supersede or terminate this Guaranty unless otherwise expressly provided either therein or herein, but shall be construed as an additional or supplementary guaranty, unless otherwise expressly provided herein.

2

(7)     Neither the giving nor the withholding by Landlord of any consent or approval provided for in the Lease shall affect in any way the obligations hereunder of Guarantor.

(8)     Neither Guarantor's obligation to make payment in accordance with the terms of this Guaranty nor any remedy for the enforcement thereof shall be impaired, modified, changed, stayed, released or limited in any manner whatsoever by any impairment, modification, change, release, limitation or stay of the liability of Tenant or its estate in bankruptcy or any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the Bankruptcy Code of the United States or other statute or from the decision of any court interpreting any of the same, and Guarantor shall be obligated under this Guaranty as if no such impairment, stay, modification, change, release or limitation had occurred.

(9)     This Guaranty, and all of the terms hereof, shall be binding on Guarantor and the successors, assigns, and legal representatives of Guarantor.

(10)     Guarantor hereby waives the right to trial by jury in any action or proceeding that may hereafter be instituted by Landlord against Guarantor in respect of this Guaranty.

(11)     If Landlord prevails in any proceeding with respect to the enforcement of this Guaranty, Guarantor will pay upon demand to Landlord all Landlord's expenses, including, but not limited to, reasonable attorneys' fees, in enforcing this Guaranty.

(12)     Should any provision of this Guaranty be determined to be illegal or unenforceable by a court of competent jurisdiction, all other provisions hereof shall nevertheless be deemed effective.

(13)     No provision of this Guaranty or right of Landlord hereunder may be modified or waived, nor shall Guarantor be released from performance of Guarantor's obligations hereunder, except by a writing duly executed by Landlord, except as otherwise provided herein.

(14)     The acceptance by Landlord of the performance of any of the Obligations under the Lease by Guarantor, including, without limitation, the acceptance of rent payments, shall constitute neither an assignment of the Lease to Guarantor nor Landlord's consent to such an assignment.

(15)     Guarantor, from time to time within ten (10) days following Landlord's written request, shall execute and deliver to Landlord such further reasonable instruments or documentation as may reasonably be requested by Landlord to ratify and confirm this Guaranty and the continuing liability of Guarantor hereunder solely as required in connection with a sale or financing of the Building.

(16)     This Guaranty shall be governed by and construed in accordance with the laws of the State of Georgia (without regard to conflicts of law rules).  The parties hereby consent to jurisdiction and venue in any Georgia court of competent jurisdiction in which the Premises are located, and agree that such court shall constitute the exclusive venue for any dispute arising hereunder. Guarantor further hereby irrevocably and unconditionally waives any objection to the laying of venue of any such dispute, action or proceeding in the courts of the State of Georgia in which the Premises are located, and hereby further irrevocably and unconditionally waives and

3

agrees not to plead or claim in any such court that any such dispute, action or proceeding brought in any such court has been brought in an inconvenient forum. Guarantor further agrees that service of any process, summons, notice or document by U.S. registered mail to the address set forth above shall be effective service of process for any dispute, action or proceeding brought against Guarantor in any such court.

(17)    This Guaranty contains all of the agreements of Landlord and Guarantor concerning the guaranty of the Lease and no prior or contemporaneous agreement or understanding pertaining to any such matter shall be effective.

(18)    Any notice given hereunder shall be in writing and may be given by certified mail, return receipt requested, personal delivery, Federal Express or other delivery service. If notice is given by certified mail, return receipt requested, notice shall be deemed given three (3) days after the notice has been deposited in the U.S. mail, postage pre-paid, addressed to Guarantor at the address set forth above and addressed to Landlord at the address for notices for Landlord set forth in the Lease. If notice is given by personal delivery, Federal Express or other delivery service, notice shall be deemed given on the date the notice is actually received by Landlord or Guarantor. Either party may, by written notice to the other party, specify a different address for notice purposes.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty under seal as of the date written below.

Dated: August 01, 2022

GUARANTOR

Witness

By: _____
Yun Zheng

Notary

5